# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZACHARY J., through his | : | |
| Parents JONATHAN and | : | |
| JENNIFER J. of Lafayette Hill, PA | : | |
| | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. 19-0652 |
| | : | |
| COLONIAL SCHOOL DISTRICT | : | |
| 230 Flourtown Rd., | : | |
| Plymouth Meeting, PA 19462 | : | |
| | : | |
| Defendant | : | Hon. Mitchell S. Goldberg |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Zachary J., a minor child with disabilities, and his Parents, Jonathan and Jennifer J. ("Plaintiffs" or the "Family"), hereby submit this Memorandum of Law in support of their Motion for Judgment on the Administrative Record.

## I.   INTRODUCTION

Zachary is a thirteen-year-old, seventh-grade student with multiple disabilities, residing with his Parents in the Colonial School District, who currently attends AIM Academy, a private licensed academic school in Conshohocken, Pennsylvania (N.T. 14-15).[1] Before attending AIM, Zachary attended school in the District at Colonial Elementary School. Id.

According to the District's most recent Reevaluation Report ("RR"), Zachary is a student primarily identified under the Individuals with Disabilities Education Act ("IDEA") as eligible for services as a child with a disability under the classification Other Health Impairment

---

[1] Citations to N.T. ____ refer to Notes of Testimony of the due process hearing, in the administrative record. Citations to P-___ or S-___ refer to a Parent or School District Exhibit.

("OHI"), with a secondary classification of Speech and Language Impairment ("SLI") (P-3). Through private evaluations predating and postdating his time in the District, Zachary is also diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), a Specific Learning Disability ("SLD") in reading fluency and essay writing/written language, and a Language Disorder characterized by weaknesses in comprehension (auditory processing, comprehension of instructions, verbal attention/working memory) and production (articulation, organization of thoughts/structure) (P-5, P-12). Private evaluations also identified significant issues with disorganization, distractibility, inattention, executive dysfunction, impulsivity, and hyperactivity, as well as performance-based anxiety (P-12).

The record establishes that the District failed to provide Zachary with an appropriate special education program and placement to meet his needs, resulting in his failure to make meaningful educational progress, and as such, the Family is entitled to compensatory education for the 2014-15 to the 2016-17 school years; and tuition reimbursement for Zachary's placement at AIM Academy for the 2017-18 and 2018-19 school years. The District also failed to appropriately evaluate Zachary during the time period at issue, entitling the Parents to reimbursement for the May 11, 2017 Independent Educational Evaluation ("IEE") by Dr. Kara Schmidt.

Despite Zachary's history of needs and deficits in major areas in school – academic, executive functioning, social-emotional, behavioral, and language, all of which are substantiated in the educational records and testimony presented at the due process hearing – the District's evaluations and programming consistently failed to identify and appropriately meet all of his pervasive needs.

Due to the District's lack of appropriate evaluations and programming, Zachary made

minimal progress at best while there. As a result, in August of 2017, after providing the District with written notice, Zachary's parents privately placed him at AIM Academy, where he has received an appropriate program and has flourished. Zachary's parents then filed a Special Education Due Process Complaint on January 2, 2018, seeking reimbursement for the May 2017 IEE, an award of compensatory education, and tuition reimbursement for AIM Academy.

Following a one-day evidentiary hearing, the presiding Hearing Officer initially limited the Family's claims to January 2, 2016, in a Pre-Hearing Memorandum and Order dated May 3, 2018, a copy of which is attached as Exhibit A. That decision rests on clear legal error and an incorrect reading of IDEA's statute of limitations. It should be reversed, and all violations related to the time period prior to January 2, 2016 be addressed. Following three further hearing dates, the Hearing Officer denied relief to the Family on all remaining issues in a written Decision dated November 16, 2018, a copy of which is attached hereto as Exhibit B. That decision was erroneous in major respects, as a matter of law, and should also be reversed by this Court. Appropriate relief should be awarded to Zachary and the Family.

## II.   ARGUMENT

### A.   SCOPE AND STANDARD OF REVIEW

The IDEA provides that an aggrieved party has the right to bring a civil action in federal district court.  In reviewing a dispute brought under the IDEA's administrative hearing process, the district court must "independently review" the record and make its own determinations based on a preponderance of the evidence, while allowing "due weight" to the findings in the state administrative proceedings. Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1982); Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Susan N. v. Wilson School Dist., 70 F.3d 751, 759 (3d Cir.

1995) (court is required to independently review decision of Hearing Officer); Wexler v. Westfield Bd. Of Educ., 784 F.2d 176, 181 (3d Cir. 1986) (same). The concept of "due weight" has been defined by the Third Circuit as requiring the District Court to conduct a "*modified de novo*" review of the decision of the administrative process below. S.H. v. State-Operated School Dist., 336 F.3d 260, 269-270 (3d Cir. 2003). This Court exercises plenary review over the legal issues presented herein. Warren G. v. Cumberland County School Dist., 190 F.3d 80, 83 (3d Cir. 1999); Susan N., 70 F.3d at 758.

### B. APPLICABLE SUBSTANTIVE STANDARDS

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education ('FAPE')." 20 U.S.C. § 1400(d)(1)(A); Endrew F. v. Douglas County School Dist. RE-1, 137 S. Ct. 988 (2017); M.C. v. Central Regional School Dist., 81 F.3d 389 (3d Cir. 1996); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988); Board of Education v. Diamond, 808 F.2d 987 (3d Cir. 1986). The mechanism employed to achieve this objective is the requirement that students have an Individualized Education Program ("IEP"). 20 U.S.C. § 1412(4). A FAPE must be provided "under public supervision and direction, ... meet the standards of the State educational agency, ... include an appropriate preschool, elementary school, or secondary school education in the State involved ... [and must be provided at] no cost to Parents." Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524-25 (2007) (citing 20 U.S.C. § 1401(9) and (29)).

The provision of a FAPE requires that a disabled student receive "significant learning" and "meaningful educational benefit." T.R. v. Kingswood Twp. Bd. Of Ed., 205 F.3d 572, 577 (3d Cir. 2000). The United States Supreme Court recently expanded upon this standard, explaining:

> When all is said and done, a student offered an educational program providing

4

"merely more than de minimis" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly...awaiting the time when they were old enough to 'drop out.'" Rowley, 458 U.S., at 179 (some internal quotation marks omitted). ***The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.***

Endrew F., at 1001 (emphasis supplied). The Court further stated that "an IEP is not a form document" and must consider "the child's present educational levels of achievement, disability ***and potential for growth***." Id. at 999 (emphasis supplied). The Third Circuit Court of Appeals has held that Endrew F. and prior precedent in this Circuit establish the same standard of "meaningful benefit" / "significant learning." K.D. v. Downingtown Area S.D., 904 F.3d 248 (3d Cir. 2018).

It is also well-settled that "education" under IDEA extends beyond academic skills and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. M.C., 81 F.3d at 393-394; Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999); D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006); Polk, 853 F.2d at 181-182; Kruelle v. New Castle County School Dist., 642 F.2d 687, 693 (3d Cir. 1981). Thus, for an IEP to be appropriate, it must offer a child the opportunity to make progress which is "meaningful" in all relevant domains under the IDEA, including behavioral, social, and emotional. Id.; Robert B. v. West Chester Area School Dist., 2005 WL 2396968 at *2 (E.D.Pa. 2005) (citing S.H., 336 F.3d at 265).

It is the District's ***non-delegable*** obligation to create an appropriate IEP. M.C., 813 F.3d at 397 ("[I]t is the responsibility of the child's teachers, therapists, and administrators – and of the multi-disciplinary team that annually evaluates the student's progress – to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly."); Carlisle

Area School Dist. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995); Furhmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993); Shore Regional v. P.S., 381 F.3d at 199; Jana K. v. Annville-Cleona School Dist., 39 F. Supp. 3d 584, 602 (M.D. Pa. 2014).

Pursuant to the above standards, the District unquestionably failed in its responsibilities to Zachary. As such, reimbursement for Dr. Schmidt's IEE and an award of compensatory education and tuition reimbursement are warranted for the time period at issue, and the Hearing Officer erred in concluding to the contrary.

### C. THE HEARING OFFICER ERRED IN FINDING CLAIMS BARRED BY IDEA'S STATUTE OF LIMITATIONS, AND THIS COURT SHOULD REVERSE THAT DECISION.

Initially, the Hearing Officer failed to consider and rule on claims for violations occurring before January 2, 2016, based on his erroneous decision regarding IDEA's statute of limitations. Exhibit A (granting District's motion to dismiss all claims arising before January 2, 2016). The statute of limitations is an affirmative defense under federal law, and therefore the District must bear the burden of proof on this issue. Fed. R. Civ. Proc., Rule 8(c); Moore v. Kulicke, 318 F.3d 561, 573 (3d Cir. 2003)), (citing Campbell v. Acuff-Rose Music, 510 U.S. 569, 590 (1994), as "holding that since fair use is an affirmative defense, the proponent carries the burden of proof.").

The specific injury raised in the Due Process Complaint relevant to the Statute of Limitations issue was the District's failure to provide Zachary with a FAPE by failing to timely and appropriately evaluate, identify, and program for all of Zachary's educational needs as a student eligible for special education services between the 2014-15 school year (September, 2014) and January 1, 2016. The evidence presented at the April 6, 2018 hearing overwhelmingly demonstrates that Parents did not know, and had no reason to reasonably discover, that Zachary

was denied a FAPE by the District during the time period at issue until some major events during the 2016-17 school year. Given that the Parents filed a complaint within two years of the time they knew or should have known of the denial of FAPE, all claims raised in the January 2, 2018 Due Process Complaint are timely, and this matter should be remanded to the administrative process to consider and adjudicate these claims.

### 1. Legal Framework

Following the 2004 Amendments to the Individuals with Disabilities Education Act ("IDEA"), there was much uncertainty as to whether §1415(b)(6)(B) and §1415(f)(3)(C) of the Act created a singular two-year cap on any remedy sought by the parents, or some other distinct limitations period. The Third Circuit, however, has definitively established that IDEA contains no two-year cap on available remedies, but rather a traditional statute of limitations that requires a party to file IDEA claims within two years of reasonable *discovery* of those claims. G.L. v. Ligonier Valley Sch. Dist. Auth., 802 F.3d 601 (3d Cir. 2015).

In analyzing the two provisions of the IDEA at issue, the G.L. court explained that "[w]hen fashioning a statute of limitations, a legislature may choose as the date from which the limitations period begins to run either the date the injury actually occurred, an approach known as an "occurrence rule," or the date the aggrieved party knew or should have known of the injury, that is, a 'discovery rule.'" Id. at 613 (citation omitted). In concluding, as the G.L. Court did, that the IDEA's statute of limitations applies a discovery rule, the court connected the accrual of the statute of limitations to *knowledge* of the injury. Id. at 616.

More specifically, the court stated: "[T]he text is clear that Congress eschewed the occurrence rule in favor of the discovery rule by hinging both §1415(f)(3)(C) and §1415(b)(6)(B) on the date the parents knew or should have known of the *injury* (emphasis added)." G.L., at 616. "In other words, plaintiff has two years from the date [he] learned or

should have learned of [his] injury to request that the School District provide [him] with a due process hearing." Lauren G. v. West Chester Area School District, 906 F.Supp.2d 375, 386-387 (E.D. Pa. 2012), citing Bantum v. Sch. Dist. of Phila., No. 10-cv-4195, 2011 WL 1303312, at 4 n. 7 (E.D. Pa. 2011).

The G.L. Court reaffirmed the standard for awarding compensatory education, holding that a child's right to compensatory education accrues from the time the school district knew or should have known of the injury to the child, and that the child is entitled to compensatory education equal to the *entire period of deprivation*. Id. at 618-19; see also, M.C., 81 F.3d at 396-97; D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 499 (3d Cir. 2012); Mary Courtney T. v. Sch. Dist. of Phila., 575 F.3d 235, 249 (3d Cir. 2009); Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 272 (3d Cir. 2007). "That standard is grounded in our understanding, then and now, that 'a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith.'" G.L., 802 F.3d at 619, quoting M.C., 81 F.3d at 397.

In the end, the court summarized the IDEA's statute of limitations to require that once a violation is reasonably discovered by the parent, any claim for that violation, however far back it dates, must be filed within two years of the "knew or should have known" ("KOSHK") date. G.L., at 626. If it is not filed timely, only educational deprivations within the most recent two years before the filing of the complaint will be adjudicated; but if it is timely filed, then the *entire* period of the violation should be remedied. Id.

### 2.    Relevant Facts

Like most arguments under the IDEA's Statute of Limitations, in the present matter, whether the Family's claims are timely hinges on the KOSHK date. At the earliest, this date is

November 2016, when Zachary announced school frustration, with a desire to die, to his parents. More significantly, however, the ***unrebutted*** testimony of Zachary's father, Jonathan J., establishes the true KOSHK date in the present case was May 11, 2017, when the Parents received the IEE completed by Dr. Kara Schmidt. Although, as Mr. J. testified, the Parents had concerns about Zachary's program in November of 2016 when Zachary expressed frustration with school and a desire to die, ***the Parents were not aware of the inappropriateness of the school program until they received Dr. Schmidt's report*** specifically identifying multiple areas of need and numerous supports and services that had not been identified or provided previously by the District (N.T. 1-41, 76-80). Regardless of which date – November of 2016 or May of 2017 – is ultimately determined to be the KOSHK date, both are within two years of the filing of the Complaint on January 2, 2018 in this matter. As such, the Parents' Complaint in this case was timely.

The Hearing Officer misapplied <u>G.L.</u> as a matter of law, and erroneously found instead, however, that the Parents knew or should have known of the claims asserted in the Complaint at the time each educational deprivation ***occurred***, rather than when they were ***discovered***. Pre-Hearing Order, May 3, 2018. In other words, the Hearing Officer applied the occurrence rule which was unequivocally rejected in favor of a discovery rule by the Court in <u>G.L.</u>

The Hearing Officer's analysis was also confined to when the Parents purportedly realized that certain documents (specifically, the RRs and the IEPs) were incomplete, in that they did not address certain aspects of Zachary's needs. Exhibit A at 6-9. This analysis is grossly lacking in this case, because, as the evidence showed, from the ***start*** of Zachary's enrollment in the District, there were many issues that were known to both the Parents ***and*** the District which were not mentioned in the IEPs -- but about which the District consistently reassured the Parents

that Zachary was receiving FAPE nonetheless, because these other issues were being fully addressed outside the IEP process. In view of these reassurances by the District, there was no evidence that the Parents knew or should have known that FAPE was, in fact, being denied, or by the Districts failure to address *all* of Zachary's learning issues, which should have been included in the IEPs. In contrast, there was ample evidence that the District *knew* of those learning issues despite not addressing them in the RRs and IEPs, and that they repeatedly – bur inaccurately – reassured the Parents, in correspondence as well as orally during IEP meetings, that all concerns were being addressed. Thus, the Parents cannot be said to have known that Zachary was being denied FAPE on the basis improperly used by the Hearing Officer, and the District cannot shield itself from the inadequacy of its off-record programs to address these issues by simply keeping them out of the IEPs from the start.

Multiple courts, including several in Pennsylvania, have refused to simply associate the KOSHK date with a date that Parents received an evaluation, IEP, or some other similar document, and instead look to events that indicate when there was or should have been *knowledge* of an actual specific denial of FAPE. Avila v. Spokane School District 81, 852 F.3d 936 (9th Cir. 2017) (collecting cases); E.G. v. Great Valley School District, No. 16-cv-5456, 2017 WL 2260707 (E.D. Pa. 2017); Lauren G., 906 F.Supp.2d at 386-387; Jana K., 39 F.Supp. 584; Centennial Sch. Dist. v. S.D. ex rel. Daniel D., No. 10-cv-4129, 2011 WL 6117278, at 5 (E.D. Pa. 2011); Bantum, No. 10-cv-4195, 2011 WL 1303312, at *4 n. 7 (E.D. Pa. 2011).

Most recently, Judge Kearney of the Eastern District of Pennsylvania addressed the issue of determining the KOSHK date in E.G. In that case, the court reversed a hearing officer decision that limited the Parents' claims to two years before the filing of the complaint. Judge Kearney applied G.L.'s discovery rule. Id., at 14. The court explained that the ". . . inquiry [into

10

the discovery date] should depend upon the particular deficiency asserted, and the parent's ability to recognize it. ***Even the assumption the student is not making progress is not enough to trigger notice*. . .**" Id., at 16 (quotation marks and citation omitted, emphasis supplied).

Similarly, Avila, which entirely adopted the reasoning of G.L., strongly supports the Parents' position here regarding the KOSHK date. The Court of Appeals there rejected the district court's reasoning that the Parents' being provided and signing forms agreeing with school district evaluations in 2006-07 automatically triggered IDEA's statute of limitations, "because the Avilas' awareness of the evaluations does not necessarily mean they 'knew or had reason to know' of the basis of their claims before April 26, 2008 [i.e., two years preceding the filing of the due process complaint]." Avila, 852 F.3d at 944. The court further summarized other cases that supported its reasoning:

> A.G. v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1205 (9th Cir. 2016) (holding that parents' consent to a disabled child's placement does not waive later challenges to the placement under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act, "at least where the issue is one that requires specialized expertise a parent cannot be expected to have"). Other courts have held that the "knew or had reason to know date" stems from when parents know or have reason to know of an alleged denial of a free appropriate public education under the IDEA, not necessarily when the parents became aware that the district acted or failed to act. See, e.g., Somoza v. N.Y. City Dep't of Educ., 538 F.3d 106, 114 (2d Cir. 2008) (holding that the "knew or should have known" date occurred when parent viewed a child's rapid improvement in a new program); Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1288 (11th Cir. 2008) (holding the "knew or should have known date" occurred after new evaluation and declining to hold that "famil[ies] should be blamed for not being experts about learning disabilities").

Id. at 944-945.

Here, Mr. J. testified at the hearing that he has no training in special education, school

psychology, the IDEA, or Section 504.[2] He testified that he and his wife were repeatedly told by District staff at IEP meetings and in other communications that Zachary was doing well despite his ADHD and difficulty with attention and focus, that he was making expected progress, and that the programming and supports provided to Zachary by the District were appropriate (N.T. 17, 32, 65-67, 76-80). As such, it was improper for the Hearing Officer to assume that merely because the Js were aware of Zachary's ADHD and were provided evaluations and IEPs that did not mention ADHD, they necessarily should have been aware that Zachary was being denied a FAPE by the District, especially since the District assured them that FAPE was being provided. Parents were also provided with report cards and progress data by the District that suggested Zachary was doing well, and these are relevant, too. His report cards between kindergarten and third grade mostly indicated scores of "proficient" or "partially proficient" in academic areas, and "satisfactory" or "outstanding" in developmental/learning related behavior areas (P-21 at 1-17). Similarly, progress reports provided to the Parents by the District also stated Zachary was doing well. Indeed, by March of 2015, the District reported to Parents that Zachary had made so much progress that he no longer qualified for language services (other than articulation), and *removed* the relevant goals from the IEP (P-6 at 17).

In communicating about Zachary's ADHD with District personnel and receiving assurance that these issues were being properly addressed, the Family simply had no reason to believe that such issues were not being properly addressed, or that the IEPs were inadequate or inappropriate. This holds true not just for Zachary's ADHD, but for his other disabilities not

---

[2] Although Mr. J. is an attorney, he has no experience in education law. Similarly, although Ms. J. is an occupational therapist who provides Occupational Therapy ("OT") to students in the school setting, she is not an expert in special education for children apart from OT issues, and the parents are not raising compensatory education claims involving OT for the period of time at issue for the statute of limitations.

included on his IEPs and RRs. What must be evaluated is the date on which the Parents in fact knew or should have known of the *actual* denial of FAPE.

Given the uncontested testimony of Mr. J., together with the report cards and progress reports from the time period before January of 2016, the Hearing Officer's conclusion that the Parents knew or should have known of the denial of FAPE to Zachary before January of 2016 is erroneous as a matter of law. As Mr. J. explained during the hearing, the first time he began to suspect that Zachary may not be receiving an appropriate program is when he learned in November of 2016 that Zachary reported that he felt stupid at school and wanted to die. In light of those statements by Zachary, the Parents pursued an IEE with Dr. Kara Schmidt. The Parents ultimately received Dr. Schmidt's report (which was promptly shared with the District) in early May of 2017. This report for the first time clarified the Parents' understanding of Zachary's *educational* needs, and confirmed for them for the first time that the programming Zachary had been receiving from the District was not appropriate (P-12).

These dates are both within the two-year timeframe of the filing of the Due Process Complaint. Since the complaint was timely, the complete period of educational deprivation is subject to full relief. G.L. The matter should be remanded to the administrative process for a determination on the merits regarding the time periods excluded by the Hearing Officer.

### D. THE HEARING OFFICER ERRED IN FINDING THAT THE DISTRICT PROVIDED ZACHARY A FAPE UNDER IDEA, AND THIS COURT SHOULD REVERSE THAT DECISION.

The Hearing Officer erred in finding that the District provided Zachary with a FAPE from January 2, 2016. Exhibit B at 11-14. The IEPs offered by the District during the limited time period in question were not designed to, and did not, confer "significant learning" or "meaningful benefit," and were certainly not "appropriately ambitious" in light of Zachary's

circumstances. See Endrew F.; Polk, 853 F.2d at 181-185. The IEPs in effect post-January 2, 2016 generally contain inadequate present educational levels, and inappropriate goals which fail to appropriately address all of Zachary's needs or provide a sufficient and objective means of monitoring progress. For example, they generally include two goals, one related to articulation and one related to written expression, but include none related to reading fluency or comprehension, executive functioning skill development (e.g., organization), behavioral and/or self-regulation skills, anxiety-based coping skills, or language skills beyond articulation (P-8, P-9, P-11). Similarly, they provide for no Direct Instruction[3] in reading, written expression language, executive functioning, behavior, or anxiety coping skills. Id.

The IEPs also include inadequate and inappropriate SDI – including, but not limited to, the provision of inappropriate academic supports, including inadequate supports for Zachary's obvious and pervasive executive functioning deficits, inappropriate and/or insufficient supports to address his needs stemming from anxiety, inappropriate behavioral supports related to his disinhibition/impulsivity not based on an appropriate functional behavioral assessment, insufficient related services, no meaningful supports for school personnel, inappropriate extended school year ("ESY") services, and inappropriate placements. Id. More importantly, the IEPs failed to provide Zachary with a program that allowed him to make meaningful educational progress.

---

[3] Direct Instruction is a research-based approach to teaching that is skills-oriented, and the teaching practices it implies are teacher-directed. It emphasizes the use of small-group, face-to-face instruction by teachers using carefully articulated lessons in which cognitive skills are broken down into small units, sequenced deliberately, and taught explicitly. In Direct Instruction, 1) students are placed in instruction at their skill level; 2) the program's structure is designed to ensure mastery of the content; 3) instruction is modified to accommodate each student's rate of learning; and 4) programs are field-tested and revised before publication. https://www.nifdi.org/what-is-di/basic-philosophy.

Although Zachary's teachers had no choice but to acknowledge during their testimony at the hearing that the IEPs in place were utterly devoid of any kind of support or instruction in the area of reading, the District attempted to justify such an obvious deficiency by dismissing any significant needs in reading and suggesting that, to the extent Zachary has needs in reading, they are solely related to his ADHD and executive functioning deficits (N.T. 197, 214, 280). To the contrary, the record clearly establishes a long history of difficulties with reading. For example, the March 2015 RR reports that curriculum-based assessments in the area of reading placed Zachary in the below basic to basic range (P-3 at 6-7). While the District nonetheless points to average scores in reading on standardized testing administered as part of the same March 2015 RR, the inconsistency between the results of the standardized testing, curriculum-based assessments, and teacher input should have caused the District to perform more illuminating reading assessments, such as administered by Dr. Schmidt.[4]

---

[4] Although the District issued an updated RR in May of 2015, it only included the review of a single curriculum writing sample and the administration of the BASC Teacher Rating Scale to Zachary's then-current classroom teacher. It included absolutely *no* additional assessments in *reading*. Conversely, Dr. Schmidt administered the Woodcock-Johnson Test of Achievement–IV ("WJ-IV") and the Gray Oral Reading Test, 5th Edition ("GORT-5"), a criterion-referenced assessment, to specifically further assess Zachary's reading skills; they revealed significant issues (P-12; N.T. 542-549). For example, Zachary performed in the 9th percentile on both accuracy and fluency, and below the 1st percentile in comprehension (P-12 at 15-16, 27-28; N.T. 545-547). Despite Zachary's well below-average performance on the GORT-5, he obtained a score in the lower end of the average range on the comprehension subtest of the WJ-IV, albeit below age and grade expectations. However, as explained by Dr. Schmidt, the WJ-IV comprehension subtest uses very brief reading passages and fill-in-the-blank questions, while the GORT-5 has longer reading passages that more closely resemble what Zachary would be required to do in school, and asks open-ended comprehension questions. On the WJ-IV subtest for reading fluency, which uses longer passages similar to the GORT-5, Zachary obtained a standard score of 62, which places him below the 1st percentile and in the "very low" range of performance. This amounts essentially to a significant difference between reading words in isolation, compared to reading and understanding sentences and paragraphs (P-12 at 15, 27-28; N.T. 542-548, 617-619). The District's psychologist, Kimberly McNamara, acknowledged the validity of the scores on academic assessments administered by Dr. Schmidt, who diagnosed him

(continued on next page)

Regardless of the cause of Zachary's reading difficulties, there seems to be no disagreement that he was struggling in reading, yet *none* of his relevant IEPs addressed reading.

The District also attempted to minimize Zachary's significant needs regarding attention/focus, behavioral regulation, and executive functioning skills. However, again, the record in this case is replete with evidence of Zachary's struggles in these areas and their impact upon his education. For example, teachers had noted that Zachary is 1) anxious or concerned about what his friends are or are not doing, and that he likes to tell them what they should be doing; 2) struggles with independent work; 3) takes longer to begin and complete tasks/work; 4) is easily distracted by his peers and becomes off-task; 5) forgets what he is supposed to be doing; and 6) needs constant redirection (P-3 at 8). Similar concerns regarding Zachary's attention and behavior were expressed by his then-current Speech and Language Therapist, Mrs. Thornton. Id. at 9. Observational data showed Zachary was passively off-task over 59% of the time, verbally off-task over 18% of the time, and off-task due to motor behaviors (e.g., biting his fingers) over 6% of the time. Id. at 12. Additionally, Zachary was not following directions, was engaged in "silly" behaviors (e.g., making faces or catching the attention of peers to mouth comments to), and displayed signs of anxiety (e.g., biting his nails). Id. at 11. Teacher and Parent rating scales on the BASC-2 revealed concerns with Hyperactivity, Anxiety, Attention Problems, Atypicality, Adaptability, Social Skills, Leadership Skills, Activities of Daily Living, Functional Communication, and Adaptive Skills. Id. at 12-14.

Concerns regarding anxiety, attention/focus, and executive functioning were also expressed by the District in the present educational levels of Zachary's IEPs in place during the time period in question (P-6 at 9; P-8 at 9; P-9 at 8; P-11 at 6). In addition, teachers expressed

with an SLD in reading fluency and written language (N.T. 546-548; 669, 678).

concerns in multiple emails to Parents, as well as in their testimony at the hearing, regarding Zachary's difficulty remaining focused, his off-task classroom behavior, calling out in class, making loud noises (e.g., whooping), moving his desk around, not remaining seated, falling out of his chair on to the floor, and not completing assignments, all of which not only interfered with his ability to learn at school but also negatively impacted his relationships with peers and increased his anxiety (P-23 at 45-69; N.T. 248-250; 470-472). For instance, other students would sigh or pull away when assigned to work with Zachary. Id.

Despite these significant executive functioning, social-emotional, and behavioral struggles at school, at *no* time during second, third, or fourth grades did the District ever properly evaluate Zachary's social-emotional, behavioral, or executive functioning needs. In direct contrast to the District's approach – which was to administer a single behavior assessment, the BASC-2 – the IEE obtained by the Parents through Dr. Schmidt used a variety of tools to assess executive functioning and attention as well as social-emotional and behavioral functioning. Specifically, in addition to a classroom observation and extensive review of records, Dr. Schmidt administered the Wechsler Intelligence Scale for Children ("WISC-V") and the NEPSY-II (which stands for "A Developmental NEuroPSYchological Assessment, 2d edition") to assess executive control and attention (P-12, at 12-13), and administered the Behavior Rating Index of Executive Functioning ("BRIEF"), the Social Responsiveness Scale ("SRS-2"), and the BASC to assess executive functioning and social-emotional and behavioral functioning. Id. at 17-18.

The IEE assessment results confirm what Zachary's records and the testimony and emails from his teachers show: that Zachary has significant needs related to attention/focus, executive functioning, self-regulation/behavior, social skills, and anxiety that were woefully unaddressed

or under-addressed by the District for years (P-12). Yet the District urged the Hearing Officer to ignore its complete failure to address Zachary's needs in this regard, instead blaming his lack of progress with regard to social-emotional, behavioral and executive functioning skills on medication issues – a litigation approach which overall succeeded, despite the Hearing Officer's ostensible disclaimer. Exhibit B at 13 (stating that Officer considered District's medication argument in context of Zachary's suicidal thoughts and found the cause of those thoughts irrelevant). However, the District offered absolutely no evidence to support its medication contention. No medical testimony or documentation was presented that even remotely suggested medication to be a significant factor in Zachary's behaviors and/or anxiety. In fact, the only hearing evidence on this suggests that medication changes were made to *reduce* behaviors, and that while at times some reduction in behavior occurred, for the most part Zachary's behaviors and levels of anxiety remained consistent (N.T. 612-613). Zachary has always had these struggles and will likely always continue to have them. What he requires is support, services and Direct Instruction in skills and strategies to overcome them -- which has been missing from the programming offered by the District. As such, the District's "blame-the-medication" defense strategy must be rejected.

The Decision points to progress reporting and report cards showing that Zachary was doing well and making progress. Exhibit B at 11-14. In fact, Zachary's progress reports are inconsistent and show minimal progress at best. His special education teachers for the 2015-2016 and 2016-2017 school years testified that they used writing samples from class, where Zachary would receive support and assistance in completing those assignments, to progress-monitor the goal (N.T. 196, 203, 279). Given that there were *no goals* related to attention/focus, on-task behaviors/assignment completion, self-regulation, executive functioning, social skills, and

18

anxiety related coping skills, there is no proper, objective progress monitoring or benchmark data. All that exists is present levels in the IEPs and emails from teachers, all of which show a continuing, and often worsening, need for support, and a lack of any meaningful progress (P-23; S-11, S-16, S-18, S-20, S-31, S-39, S-58, S-60, S-62, S-65.)

Similarly, relying upon Zachary's report cards to assess progress in this case is entirely inappropriate.[5] Zachary's grades do not report on all of his specific skill deficits with any level of specificity or objectivity to determine progress. Moreover, where the actual curriculum-based assessment scores were available, those scores are inconsistent with the grades reported on Zachary's report card. For example, while the March 2015 RR reports curriculum assessments in writing and reading to be at the very low levels of "basic" to "below basic," report cards during the same time state Zachary's reading and writing levels to somehow be proficient to partially proficient -- something that even the District's school psychologist was forced to acknowledge was concerning (Compare P-3 at 6-8 to P-21; N.T. 657-663).

The programs provided by the District from January 2, 2016 forward failed to provide Zachary with meaningful benefit through a fully appropriate program and placement, and were not designed to confer either significant learning or meaningful educational benefit. Despite overwhelming evidence of academic, social, emotional, and behavioral deficits and needs – including executive functioning and learning-related behaviors – the District failed to appropriately address Zachary's needs in these critical areas.

---

[5] It is axiomatic that the mere ability of a student to maintain satisfactory grades does not establish that a District has provided a student with a FAPE, particularly where other significant areas of need, including in the areas of attention, executive functioning, emotional functioning, and behavior, are inadequately addressed. Rowley, 458 U.S. at 203 n.25 ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'"); Endrew F., 137 S.Ct. at 999.

The Hearing Officer erred in concluding that the District provided Zachary a FAPE during his 2015-2016 school year (after January 2, 2016), based primarily on his assessment of Zachary's purported progress as measured by his grades, which masked his major educational deficits. As objective assessments in Dr. Schmidt's IEE revealed, however, Zachary was far behind his peers in multiple educational areas, including in reading, and his IEP did not provide Zachary appropriate instruction and supports (including SDIs) in such areas, and also contained no measurable goals in those areas. Moreover, curriculum-based assessments demonstrated that Zachary was well below his cognitive potential in major academic areas, including reading and writing. Despite Zachary's grades, he still obviously struggled with reading, writing, attention, attendance, emotional functioning, and executive functioning, yet the District made no substantive changes to his IEP, and did not propose a reevaluation. See West Chester Area School Dist. v. Bruce C., 194 F. Supp.2d 417, 421 (E.D. Pa. 2002) (academic progress cannot serve as the sole "litmus test" for compliance with IDEA); G.D. v. Wissahickon School Dist., 832 F.Supp.2d 455, 466 (E.D. Pa. 2011) ("the District had an obligation to look beyond simply Jack's cognitive potential or academic progress and to address the attentional issues and behaviors that [student's teacher] had identified as impeding his progress").

For similar reasons, the Hearing Officer further erred in concluding that the District provided Zachary a FAPE during his 2016-2017 school year, again based primarily on his assessment of Zachary's purported progress as measured by his grades, and progress monitoring that did not address or measure areas of critical educational need for Zachary. Furthermore, while the Hearing Officer correctly found that the District committed major procedural violations of IDEA during this school year, he erred in finding that the violations did not cause educational harm to Zachary and were not substantive violations that merited relief.

Due to the District's failure to appropriately evaluate and identify and program for all of Zachary's needs, he went without an appropriate program while at the District. As such, this Court should determine that he is entitled to compensatory education from January 2, 2016 through the 2016-2017 school year, and remand to the administrative process to determine compensatory education prior to January 2016.

When a school district fails to provide FAPE, it is well-settled that compensatory education is an available remedy for the student under the IDEA. Lester H. v. Gilhool, 916 F.2d 865, 868-69 (3d Cir. 1990); Ridgewood, 172 F.3d at 250 n.11; M.C., 81 F.3d at 397. Compensatory education is designed to provide eligible students with the benefit of the services they should have received pursuant to a FAPE. Lester H., 916 F.2d at 873 (award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of his FAPE). The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. M.C., 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. Lester H., 916 F.2d at 873. The Third Circuit has found that an appropriate remedy for a failure to provide FAPE is "the establishment of a fund to be spent on the child's education." D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 498 (3d Cir. 2012). The court in G.L. also made clear that any award of compensatory education is intended to "make whole" a child for a school district's failure to provide FAPE, even if the period of deprivation extends beyond the limitations period. G.L., 802 F.3d at 624-26.

In the present matter, for the reasons discussed above, the District failed to meet

Zachary's needs and deprived Zachary of FAPE. Accordingly, he is entitled to compensatory education for the entire period of deprivation under IDEA, and the Hearing Officer erred in ruling otherwise. This Court should determine the compensatory education due from January 2, 2016 to June 2017, and the matter should be remanded to the administrative process with a directive to determine the level of compensatory education due prior to January 2, 2016.

### E. UNDER IDEA, THE PARENTS ARE ENTITLED TO REIMBURSEMENT FOR ZACHARY'S PLACEMENT AT AIM ACADEMY FOR THE 2017-2018 AND 2018-2019 SCHOOL YEARS, AND UNTIL SUCH TIME AS THE DISTRICT DEVELOPS AND IMPLEMENTS AND APPROPRIATE PROGRAM FOR ZACHARY.

IDEA permits the parents of an eligible child with disabilities to seek reimbursement for the costs associated with a private school placement unilaterally made by the parents under certain circumstances. Shore Reg'l. v. P.S., 381 F.3d at 198-99. The Supreme Court has clearly established that when a school district's IEP is inappropriate, and when the parents obtain and pay for an appropriate private program along with other equitable considerations, the school district must fund the private program provided by the child's parents. School Comm. of Burlington v. Dept. of Educ. of Massachusetts, 471 U.S. 359, 370-371 (1985); Florence County School Dist. Four v. Carter, 510 U.S. 7, 14 (1993).

In determining whether tuition reimbursement should be awarded to a parent, a court or hearing officer is required to determine: (1) whether the program and placement offered by the school district at the time the child was enrolled in the private school was appropriate; (2) if not, whether the private school selected by the parents was appropriate; and (3) whether the equities in the case favor reimbursement. Id. As set forth below, the Parents established all three prongs of the Burlington – Carter tuition reimbursement analysis, and the Hearing Officer improperly denied reimbursement. Exhibit B at 14-15.

i.    **The first prong of the tuition reimbursement analysis is met, as the**

**Colonial School District failed to provide Zachary with an appropriate program at the time of his withdrawing.**

The Hearing Officer erred in concluding that the District's proposed July 2017 IEP – the District's last offered IEP before Zachary started at AIM – offered Zachary a FAPE. The IEP failed in significant aspects to provide Zachary a FAPE, as it contained, inter alia, inappropriate and inadequate goals and SDIs, failed to include many of the supports recommended by Dr. Schmidt in her IEE, and failed to place Zachary in an appropriate educational setting, all of which were necessary for Zachary to make meaningful educational progress.

In Zachary's case, the IEPs offered at or after the time of his withdrawal from the District – dated May 19, 2017; July 13, 2017; and September 22, 2017 – provide, for the most part, the same inappropriate programming that the District provided to Zachary since the third grade (P-11, P-13, P-15).

Although the Parents provided the District with a copy of Dr. Schmidt's thorough and comprehensive IEE well in advance of the May 19, 2017 IEP meeting, the District – without any meaningful analysis or basis – essentially ignored the report's findings and recommendations.[6] For example, although the District disagreed with Dr. Schmidt's diagnosis of SLD in reading and written expression, the District nevertheless agreed that Zachary's disability (i.e., ADHD/executive dysfunction) impacts his reading and written expression. Despite acknowledging needs in writing and reading, the May 2017 IEP includes essentially the same inadequate writing goal that had been in Zachary's IEPs for years, and *no* goals, Direct Instruction or supports of any kind related to reading (P-11; N.T. 280, 290-291). The District also agreed that Zachary has attention/focus, behavior/self-regulation, and executive functioning

---

[6] The District also back-dated the IEP to May 11, 2017 so as to appear to be in compliance with the requirement to hold a yearly annual IEP meeting (N.T. 283-284).

deficits stemming from his diagnosis of ADHD, *yet* the May 2017 IEP is ***devoid of any*** goals or Direct Instruction in executive functioning skills, study skills, self-regulation/behavior, task initiation/completion, etc. Id.

Similarly, Zachary's records and the testimony of his Parents and teachers, as well as the evaluation and testimony of Dr. Schmidt, revealed significant social-emotional and anxiety-related concerns. Yet, once again, the May 2017 IEP included ***no*** goals, supports, or instruction in social skills or coping strategies. Id. The District, however, was quick to point out that when they tried to offer a social skills group, the parents refused. While it is true that a social skills group was discussed – although not in the context of an IEP meeting – and concerns were expressed, the District never formally offered social skills of any kind, and the Parents never rejected an IEP or Notice of Recommended Educational Placement ("NOREP") that provided for such support (N.T. 369-373, 377). As Zachary's mother explained, the District discussed the idea of a social skills group, but concerns were raised because participation in this group would have required Zachary to leave class, causing him embarrassment, which would result in ***higher*** anxiety levels – a concern that had been raised by the District regarding a variety of supports. Id. Because of the concern over anxiety, it was ultimately determined that Zachary would not participate in a social group, and no alternative was proposed.

Dr. Schmidt also found significant language needs beyond production of the /r/ sound, yet there are ***no*** goals or Direct Instruction/service to address these language skills, nor did the District issue a permission to re-evaluate ("PTRE") for further speech and language assessment (P-12; P-11; N.T. 497, 674-675). Although the May 2017 IEP includes some additional supports listed under SDI as compared to previous IEPs, the IEP does not include the majority of the critical specially designed instruction recommended by Dr. Schmidt, including, among others: 1)

24

the provision of reading intervention using a sequential, multisensory research-based reading program to address delays in reading accuracy and fluency, and phonological working memory; 2) research-based writing instruction; 3) specialized instruction in study and executive functioning skills; 4) speech and language services; 5) social skills instruction; 6) frontloading, pre-teaching and re-teaching of concepts; 7) active learning strategies and the use of hands-on approach; 8) instruction in retrieval strategies; 9) assistive technology; 10) a copy of teacher/lecture notes; 11) review of study guides with teachers before tests; 12) assistive technology; 13) an Occupational Therapy evaluation; and 14) a Functional Behavior Assessment ("FBA") (Compare P-12 to P-11).

Regarding placement, Dr. Schmidt recommended a school program that provides SDI and research-based support, as well as a low student-to-teacher ratio, hands-on/multisensory teaching, individualized one-on-one instruction/mentoring as needed, and study/executive functioning skills practice throughout the day (P-27, at 22). The May 2017 IEP avoids these recommendations and offers placement in large regular-education classrooms for the entirety of his day (P-11).

In an effort to defend its woefully inadequate May 2017 IEP, the District took exception to Dr. Schmidt's diagnostic conclusions and recommendations. The last evaluation completed by the District was its March 2015 RR, which at the time was over two years old (P-3). If the District disagreed with any of the findings or recommendations by Dr. Schmidt, it should have issued – and was obligated to issue – a PTRE and conducted its own assessment to dispute Dr. Schmidt's findings, but it chose not to (N.T. 674-675).[7] Although the Hearing Officer agreed

---

[7] Throughout the hearing, the District suggested that because Ms. J. is an Occupational Therapist who works through a contract agency in public schools, she should have requested an evaluation
(continued on next page)

with this, he incredibly found that the District's failure was merely "procedural" and not substantive, thus essentially involving a form of harmless error, despite the obvious and profound effect on Zachary's educational program. Exhibit B at 13-14. This is error as a matter of law.

After the Parents rejected the May 2017 IEP, the District convened another IEP meeting on or about July 13, 2017, in which the Parents participated (P-13). With the exception of a handful of additional SDI, the July 2017 Revised IEP (which the Hearing Officer calls the "Revised 2017 IEP") is identical to the May 2017 IEP. The July 2017 Revised IEP includes the same two goals related to articulation and written expression included in the IEPs for the past several years, and there are still no goals or Direct Instruction/services for reading, behaviors/self-regulation, social skills, anxiety-related coping skills, or language beyond articulation (P-13 at 19-20). While the July 2017 Revised IEP included some level of Direct Instruction in executive functioning skills, it still fails to include any goals to guide/inform the instruction or monitor progress. Additionally, the instruction in executive functioning is to occur "2 to 3 times per week when no new instruction is happening in the classroom." Id. at 21. Based on this vague description of the inadequate frequency and intensity, this instruction could be provided for a total of 30 minutes one week, five minutes another week, and not at all yet another week. As such, the proposed instruction does not remotely provide Zachary with the consistent, intensive instruction he requires and that was recommended by Dr. Schmidt. The Parents thus correctly rejected the inappropriate July 2017 IEP, and provided the District with written notice

---

of Zachary. The obligation to evaluate and identify the needs of a student eligible for services under the IDEA rests solely with the School District, and its attempt to shift that non-delegable obligation to the Parents was inappropriate. See M.C., 813 F.3d at 397, and cases cited supra at pp. 5-6.

of their intent to withdraw Zachary and place him at AIM Academy on August 18, 2017 (P-23, at 75).[8]

The Hearing Officer especially erred in basing his decision on supports that Zachary supposedly "would have" received, even though they were not set forth in the IEP itself. It is abundantly well-settled that the correct analysis for determining the appropriateness of the IEP at issue is restricted to the IEP as *written* rather than predicting what services the District *might* have provided outside the IEP. Susan N., 70 F.3d at 762 ("The measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date.") (internal quotations omitted); Fuhrmann, 993 F.2d at 1040 (same); Norristown Area School Dist. v. F.C., 636 Fed. Appx. 857, 862 (3d Cir. 2016) (court held that IEP was inappropriate for providing that required one-on-one support would end several months into school year, rejecting school district's argument that the IEP could have been revised in the future to continue one-on-one support; "Because one-on-one support was critical to F.C.'s ability to attain a 'meaningful educational benefit,' the parents were justified in questioning the adequacy of F.C.'s third-grade IEP and in removing him from the school district for third grade."); R.E. v. New York City Dep't of Educ., 694 F.3d 167, 187 (2d Cir. 2012) ("The appropriate inquiry is into the nature of the program *actually offered in the written plan*.") (emphasis added).

As the Court found in R.E., it is especially important in questions of tuition

---

[8] In response to the Parents' having withdrawan Zachary, the District convened yet another IEP meeting, on or about September 22, 2017. However, the September 2017 IEP was developed *after* Zachary had begun attending AIM Academy (N.T. 132-133). The September 2017 IEP was thus not available to the Parents at the time they withdrew Zachary from the District, and as such, was correctly disregarded by the Hearing Officer in his findings of fact and analysis of tuition reimbursement. Decision at 7-8, 14-15. Norristown Area School Dist. v. F.C., slip op., no. 2:13-cv-05612 (E.D. Pa. Sept. 2, 2014), aff'd, 636 Fed. Appx. 857, 2016 WL98571 (3d Cir. Jan. 8, 2016).

reimbursement that IEPs be assessed *as offered*, because parents must make placement decisions according to what is actually offered in the IEP, not later testimony about additional or different services that the District "would have" provided notwithstanding their absence from the IEP:

> In order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy before making a placement decision. At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents.

R.E., 694 F.3d at 186. Thus, "[i]n determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision. Id. (citing Fuhrmann, 993 F.2d at 1039-40. Accordingly,

> an IEP must be evaluated prospectively as of the time it was created. Retrospective evidence that materially alters the IEP is not permissible. This rule recognizes the critical nature of the IEP as the centerpiece of the system, ensures that parents will have sufficient information on which to base a decision about unilateral placement, and puts school districts on notice that they must include all of the services they intend to provide in the written plan.

Id. at 188. Zachary's Parents had to decide whether the IEPs as written offered Zachary an appropriate program at the time they were offered, not whether the IEPs plus additional supports or services *not* included in the IEPs that the District "may" have theoretically provided in the future would have done so.

Accordingly, for the reasons stated above, the Parents met the first prong of the tuition-reimbursement analysis, and the Hearing Officer erred in finding otherwise.

Because the Hearing Officer mistakenly found that the District's proposed IEPs were appropriate and offered Zachary a FAPE, he did not consider the two additional prongs of the tuition reimbursement analysis: the appropriateness of the private school, and whether the

equities call for any reduction in the tuition award. However, it is clear that the Parents met their burden of proof regarding these prongs as well.

> ii.    **The second prong of the tuition reimbursement analysis is met, as AIM Academy is an appropriate program and placement for Zachary.**

The second prong of the Burlington - Carter tuition reimbursement analysis requires the Court to determine whether the private school selected by the Parents, in this case AIM Academy, is appropriate. Burlington, 471 U.S. 359. The Parents' burden to establish the appropriateness of the private school at issue is not a heavy one, and considerable leeway must be given to the Parents' choice of private school. More specifically:

> A parent's decision to unilaterally place a child in a private placement is proper if the placement "is appropriate, i.e., it provides significant learning and confers meaningful benefit...." [Lauren W. v.] DeFlaminis, 480 F.3d at 276 (internal quotation marks and citation omitted). That said, the "parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA." Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 249 n. 8 (3d Cir. 1999). In fact, the Supreme Court has ruled that a private school placement may be proper and confer meaningful benefit despite the private school's failure to provide an IEP or meet state educational standards. Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 14-15 (1993).

Mary Courtney T., 575 F.3d at 242.

Pursuant to these standards, the evidence showed that AIM Academy is clearly an appropriate placement for Zachary. In contrast to the District's program, AIM Academy provides Zachary with the small, supportive environment he requires, while still providing him with a challenging curriculum commensurate with his ability level.

At AIM, Zachary participates in a full class schedule within a structured learning environment with instruction delivered in small groups of up to six students for his core academic subjects (P-22, at 1). Zachary is supported with SDI, including close proximity to the teacher, repetition and review of all instruction and directions, extended time to complete assignments, chunking of information, and frequent breaks from instruction. Id. Zachary is also

provided with organizational strategies, such as outlines and checklists, to assist with completion of tasks independently. Id. Additional supports, including one-to-one supportive writing, graphic organizers, multi-sensory instruction, and teacher modeling are provided. Id. All of Zachary's core teachers are certified special education teachers, and his teacher for Comprehensive Literacy, Writing, and Math is also a certified reading specialist. In addition to a daily 90 minute block in ELA (English Language Arts), Zachary also receives 45 minutes per day of Direct Instruction in reading and reading comprehension with two other peers in his Comprehensive Literacy Instruction class (P-22, at 1; N.T. 568). In addition to the executive functioning supports and instruction embedded into the program at AIM, Zachary receives additional Direct Instruction in executive functioning skills two times per week during OT (one session of which is a push in session in the classroom) and one time per week with his counselor (P-22; N.T. 567). Zachary also receives Speech and Language Therapy two times per week where, in addition to articulation skills, Zachary receives additional Direct Instruction in written expression (e.g., expanding paragraph writing, organization of thoughts, etc.), instruction in contextual language, and pragmatic language (i.e., social language). (P-25; N.T. 567).

Most importantly, however, because of the appropriateness of his program and placement, Zachary has been doing exceptionally well since attending AIM.[9] Progress reports, evaluations, and progress monitoring data all demonstrate significant gains in all areas of Zachary's needs (P-22, P-24, P-25, P-26). In addition to the data, the classroom observation at

---

[9] The Hearing Officer made no findings about the appropriateness of AIM Academy in this analysis. Decision at 14-15. Before the Hearing Officer, however, although the District attempted to argue that AIM was not appropriate, it offered no evidence to support this conclusion or to challenge the documentary evidence and testimony presented by the Parents. The District could very easily have requested the opportunity to observe Zachary at AIM and to evaluate Zachary and his progress. However, as has been the case throughout Zachary's time in the District, the District sought to neither observe nor evaluate Zachary.

AIM conducted by Dr. Schmidt shows that although still significantly impacted by his ADHD and executive functioning, given the learning environment at AIM and with the Direct Instruction and observed supports provided in the classroom at AIM, Zachary is much improved (P-20; N.T. 561-566). Not only is he making academic progress, but he is doing very well socially and emotionally, and is happy ***at last*** to go to school each day.

For all of the reasons discussed above, the Parents established the appropriateness of AIM Academy, and therefore met the second prong of the reimbursement analysis.

> **iii.   The third prong of the tuition reimbursement analysis is met, as the equities in the case favor reimbursement of tuition for Zachary's placement at AIM Academy.**

The parents further met the third prong of the tuition reimbursement analysis. The third prong of the <u>Burlington - Carter</u> tuition reimbursement analysis requires this Court to consider the equities in this case and determine whether they weigh in favor of reimbursement. <u>Burlington</u>, 471 U.S. 359; <u>Carter</u>, 510 U.S. 7; <u>Warren G.</u>, 190 F.3d 80. As such, tuition reimbursement may be reduced or denied in one of three circumstances: (1) where the parents failed to provide the District with written notice of their intent to withdraw their child from the public schools and seek reimbursement for private placement; (2) where the public school expressed its intent to evaluate the student at the time of withdrawal (through the issuance of a permission to evaluate) and the parents failed to cooperate in the evaluation; and (3) where the parents are judicially determined to have acted unreasonably. 34 C.F.R. § 300.148(d).

In the present case, the Parents provided the required notice and acted reasonably at all times. There is no equitable basis to reduce or deny tuition reimbursement. More specifically, the Parents have always been up-front in all of their communications and interactions with the District, expressing their concerns about Zachary's program when concerns arose (P-23). The Parents obtained an independent evaluation of Zachary while in the District and promptly shared

that report with the District (P-12; N.T. 120). The Parents always provided consent to the District to conduct any evaluation it requested (although, with the exception of mandated re-evaluations, the District never offered to evaluate), and they attended and fully participated in all IEP meetings. Moreover, before Zachary's withdrawal from the District, in January of 2017, the Parents provided written notice of their intent to withdraw Zachary and seek reimbursement (P-23, at 75).[10]

Clearly, the equities favor awarding tuition reimbursement, and the Parents have met the third prong of the tuition reimbursement analysis. The Hearing Officer thus erred in failing to find that the District should reimburse Parents for Zachary's AIM Academy tuition for the 2017-18 and 2018-19 school years.

### F. THE PARENTS ARE ENTITLED TO REIMBURSEMENT FOR THE INDEPENDENT EDUCATIONAL EVALUATION BY DR. KARA SCHMIDT.

The Hearing Officer grievously erred in stating that Dr. Schmidt's IEE revealed little information that the District had not already found, that she had not consulted Zachary's teachers, and that the District's IEPs already followed her recommendations. Exhibit B at 15. These statements are demonstrably incorrect, as detailed in the sections above. Dr. Schmidt is a highly experienced and respected neuropsychologist, and her evaluation methods and report were both entirely proper. Dr. Schmidt sought, and obtained, input from Zachary's teachers via rating scales, two classroom observations (in the District and at AIM), and discussions with Zachary's

---

[10] The District unsuccessfully attempted at the hearing to paint a picture of the Parents regularly refusing services that the District offered. While there were a few occasions were the District discussed services, and on one of those few occasions the Parents indicated a concern – which they understood was shared by the District – over participation in a social skills group that would require Zachary to be pulled from class, the Parents never refused any offer of any service by the District. Until May of 2017, they had never rejected an IEP or NOREP proposed by the District.

teachers following the observations (N.T. 522-524, 527-528, 558-560, 561-568; P-12, at 6-9, 19).

The IDEA sets forth the right of a parent to obtain an IEE at public expense if the parent disagrees with the District's evaluation and the evaluation is determined inappropriate. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(b)(1). The regulations further provide that "[i]f a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either – (i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or (ii) Ensure that an independent educational evaluation is provided at public expense...." 34 C.F.R. § 300.502(b)(2). In Schaffer v. Weast, 546 U.S. 49 (2005), the United States Supreme Court forcefully addressed this entitlement to an IEE, expressly stating that parents:

> have the right to an independent educational evaluation of their child [, and IDEA's] regulations clarify this entitlement by providing that a parent has the right to an independent educational evaluation at public expense if the parent disagrees with the evaluation obtained by the public agency. IDEA thus ensures parents' access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition.

Id. at 60-61 (internal citations omitted).

The requirements for an appropriate evaluation by a school district are set out in the IDEA and its implementing regulations, see 34 C.F.R. §§ 300.301-300.310, and require, among other things, that an evaluation, including reevaluations, must include a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information from the parents, and assess the child in all areas of suspected disability. 34 C.F.R. § 300.304. Moreover, an evaluation must be sufficient in its scope to identify the educational needs of a student, whether commonly linked to the student's disability category or not, including present educational levels and related developmental needs,

and assist in determining what supports and modifications to the student's program are necessary. 34 C.F.R. §§ 300.304 and 300.305.

In the present matter, for the reasons discussed in detail above, the District's Evaluation Reports ("ERs") and RRs during the time period in question are woefully inadequate, failing to thoroughly and comprehensively assess all areas of suspected need, which resulted in Zachary receiving inappropriate programming during the entirety of the time period in question, and for a period of time, being wrongly excluded or exited from special education. See Z.B. v. District of Columbia, 888 F.3d 515, 523 (D.C. Cir. 2018) ("The evaluation requirement 'serves a critical purpose: it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child.'") (quoting Timothy O. v. Paso Robles Unified School Dist., 822 F.3d 1105, 1119 (9th Cir. 2016)). Similarly, for the reasons stated above, and in direct contrast to the District evaluations, the IEE by Dr. Kara Schmidt comprehensively assessed all areas of Zachary's suspected needs.[11] The Hearing Officer erred in giving almost no weight to Dr. Schmidt's comprehensive report, and its conclusions and recommendations, in failing to provide a proper basis for that determination, and in denying the Family's request for reimbursement of Dr. Schmidt's IEE costs. Accordingly, the Parents should be awarded reimbursement for the costs associated with Dr. Schmidt's evaluation.

---

[11] The District made several attempts to challenge a few aspects of Dr. Schmidt's evaluation process, as well as her ultimate diagnoses and recommendations; those arguments have been addressed above. However, the only individual who testified to dispute Dr. Schmidt's thorough and comprehensive evaluation and sound conclusions was the District's school psychologist, Ms. Kimberly McNamara, who, for over three years before the hearing, had absolutely *no* involvement in Zachary's program or with Zachary. Further, unlike Dr. Schmidt, who more recently observed Zachary in his current setting at AIM and reviewed his educational records, Ms. McNamara did neither (N.T. 670).

## G. THE HEARING OFFICER ERRED BY FAILING TO RULE THAT THE DISTRICT VIOLATED SECTION 504.

Because the District violated IDEA by failing to provide Zachary a FAPE, it also violated Section 504. The Hearing Officer erred in not so ruling, and in that regard, the Decision should be reversed, and the District should be found to have violated Section 504. "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).

Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. James S. v. School Dist. of Phila., 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing Molly L. v. Lower Merion School Dist., 194 F. Supp.2d 422, 426 (E.D. Pa. 2002)). Section 504 "is broader in scope [than [IDEA].... The definition of 'individual with a disability' under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disabilit[y]' under the IDEA." Muller v. Commission on Special Educ. of E. Islip Union Free School Dist., 145 F.3d 95, 100 n.2 (2d Cir. 1998). A school may violate Section 504 independent of any violations of IDEA. Lauren G., 906 F.Supp.2d 375 (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period of time for which no relief was granted under IDEA).

Zachary is a student who, at all times relevant to this Memorandum, is and was disabled, and is and was otherwise qualified to participate in, and receive equal benefits from, the Defendant's educational programs with appropriate instruction, accommodations and supplemental supports for purposes of Section 504.

35

The Hearing Officer also erred in not awarding relief under Section 504. Defendant's failure to offer Zachary a non-discriminatory, appropriate educational environment resulted in his being excluded from participation in, denied the benefits of, or subject to discrimination in, his educational program. The evidence established that the District violated Section 504 by failing to properly evaluate Zachary and failing to provide or offer Zachary an appropriate program that addressed all of his various disabilities, for the time period at issue, all of which denied him a meaningful educational benefit.

As under IDEA, when a school district fails to provide FAPE, it is well-settled that compensatory education is an available remedy for the student under Section 504. Ridgewood, 172 F.3d at 253 (there are few differences, if any, between IDEA's affirmative duty and Section 504's negative prohibition); Centennial Sch. Dist. v. Phil L. ex rel. Matthew L., 799 F. Supp. 2d 473, 488 (E.D. Pa. 2011).  The substantive requirements of Section 504 in the education context are at least equivalent to the requirements under the IDEA and, in some circumstances, provide additional protections to students with disabilities and their families.  Lauren G., 906 F. Supp.2d at 392-93; James S., 559 F. Supp.2d at 620 (citing Molly L., 194 F. Supp.2d at 426).

For the reasons discussed above, the District failed to meet Zachary's needs and thereby deprived Zachary of FAPE. Accordingly, he is entitled to compensatory education for the entire period of deprivation under Section 504, and the Hearing Officer erred in ruling otherwise.

Tuition reimbursement is also clearly an available remedy under Section 504, as well as under IDEA. Molly L., 194 F. Supp. 2d at 429 n.7 ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA."); Kevin M. v. Bristol Twp. School Dist., 2002 WL 73233, at *5 (E.D. Pa. Jan. 16, 2002) (because there are "few differences, if any," between requirements of IDEA and Section 504, "[t]he Court ... finds that plaintiff may

pursue his tuition reimbursement claim against Bristol Township pursuant to Section 504 as well as IDEA."); Borough of Palmyra., Bd. Of Educ. v. F.C., 2 F. Supp. 2d 637, 641-42 (D.N.J. 1998) (rejecting argument that tuition reimbursement is not available form of relief under Section 504); Christen G. v. Lower Merion School Dist., 919 F. Supp. 793, 816, 821 (E.D. Pa. 1996) (reimbursement for costs of private school education was appropriate relief under both the IDEA and Section 504).   Therefore, for the reasons set forth above in the IDEA analysis, tuition reimbursement should be granted at AIM.

### H. THE HEARING OFFICER ERRED IN FAILING TO AWARD COMPENSATORY EDUCATION AND TUITION REIMBURSEMENT UNDER THE ADA.

Because the District violated IDEA and Section 504, it also violated the ADA. The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." Jeremy H. v. Mount Lebanon School Dist., 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. Id.; see also Tereance D. v. School Dist. of Philadelphia, 548 F. Supp.2d 162, 169-70 (E. D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504); Indiana Area School Dist. v. H.H., 428 F. Supp.2d 361, 363 n.3 (W. D. Pa. 2006) ("[T]he Third Circuit generally has held that the same analysis under § 504 applies in determining whether a defendant's actions violate the ADA.")

Zachary is a qualified individual with a disability for purposes of the ADA. As set forth

above, the District excluded Zachary from participation in, and denied him the benefits of the services, programs or activities of, a public entity. Therefore, Zachary should also be awarded compensatory education and tuition reimbursement under the ADA.

Respectfully submitted,

/s_____
John W. Goldsborough, Esquire
ID No. 73063
Michael J.  Connolly, Esquire
ID No.  82065
Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS, MEHALICK, CONNOLLY,
HULSE, RYAN & MARONE P.C.
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)

Attorneys for Plaintiffs

38

### Certificate of Service

I hereby certify that a copy of the foregoing Plaintiffs' Motion for Judgment on the

Administrative Record, Memorandum of Law in Support thereof, and Order was served upon the

following person in the manner indicated below, which service satisfies the requirements of the

Federal Rules of Civil Procedure:

## VIA ELECTRONIC FILING

Karl Romberger, Esquire
Sweet, Stevens, Katz & Williams
331 East Butler Avenue
P.O. Box 5069
Doylestown, PA 18901


/s/_____
John W. Goldsborough, Esquire


Dated:        September 30, 2019