| In re: Z.J., a Student in the Colonial School District | ODR No. 20099-1718KE |
|---|---|

## PRE-HEARING ORDER

### Introduction

On January 2, 2018, the Parents filed a complaint against the District alleging various violations of the Student's rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 701 *et seq.* The Parents demand, *inter alia*, compensatory education from the 2014-15 school year through the end of the 2016-17 school year, including extended school year (ESY) services.

The District moved to strike all claims arising before January 2, 2016, raising the IDEA's two-year statute of limitations as a defense. In response, the Parents averred that they did not know of, and had no reason to know of the actions forming the basis of their complaint until May 11, 2017. As discussed below, May 11, 2017 is the Parent's alleged "knew or should have known" or KOSHK date. The District argues that the Parents either had actual knowledge of the actions forming the basis of their claims earlier, or that reasonably diligent parents would have discovered those actions earlier.

I convened a hearing session so that the parties could present evidence to establish the KOSHK date. After the hearing, I accepted briefs from the parties.

### How to Find the KOSHK Date

The parties disagree about how to find the KOSHK date, regardless of the facts. The Parents argue that the KOSHK date occurs when they became aware of the Student's alleged injuries. The District argues that the KOSHK date occurs when the Parents learned of the District's actions. There is some support in current jurisprudence for both positions.

The IDEA's statute of limitations is found at 20 U.S.C. § 1415(f)(3)(C), which states:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

If parents raise a complaint within two years of the KOSHK date, the statute of limitations imposes no bar on recovery. *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601 (3d Cir. 2015). The *G.L.* decision was groundbreaking, and there has been vigorous debate about what factors establish the KOSHK date since that decision was issued.

My own analysis on this issue has developed over time, thanks in part to a remand from Judge Kearney of the U.S. District Court for the Eastern District of Pennsylvania. *See E.G. v. Great*


EXHIBIT A

*Valley Sch. Dist.*, No. 16-5456, 2017 U.S. Dist. LEXIS 77920 (E.D. Pa. May 23, 2017). Prior to the *E.G.* case, I read the statute to focus on parents' knowledge of schools' actions. I concluded that the KOSHK date came when parents knew or should have known of the *action* forming the basis of their complaint. Said differently, I looked to when parents knew what the school was doing. The *E.G.* case affirmed my definition of the word "action," but held that something more is needed to start the two-year clock. The court held that the statute of limitations begins to run when parents know or should know both of the school's actions and of the alleged violations. *Id* at *21-22. Knowledge of the action and knowledge of the violation "can happen on the same day or be spread over months or years." *Id* at 22. Further, I cannot make a blanket KOSHK determination for the entire case. Rather, through a fine-grained analysis, I must determine the KOSHK date for each alleged violation. *Id* at 22-23.

Other cases show how to determine when the Parents knew or should have known of each alleged violation. Courts have applied what has been characterized as the "IDEA's discovery rule" to "focus[] on clear action or inaction by a school district sufficient to alert a reasonable parent that the child would not be appropriately accommodated." *Brady P. v. Cent. York Sch. Dist.*, No. 1:16-CV-2395, 2018 U.S. Dist. LEXIS 43230, at *19-20 (M.D. Pa. Mar. 16, 2018) *citing B.B. by & through Catherine B. v. Del. Coll. Preparatory Acad.*, No. 16-806, 2017 U.S. Dist. LEXIS 70245, 2017 WL 1862478, at *3 (D. Del. May 8, 2017); *Solanco Sch. Dist. v. C.H.B.*, No. 5:15-CV-02659, 2016 U.S. Dist. LEXIS 104559, 2016 WL 4204129, at *7 & n.10 (E.D. Pa. Aug. 9, 2016); *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 600 (M.D. Pa. 2014).

The "reasonable parent" standard highlights the potential delay between a school's "clear action or inaction" and the parents' understanding that the "child would not be appropriately accommodated." *E.G. v. Great Valley* at *22-23. Moreover, the inquiry calls for consideration of what conclusions a reasonable parent could draw from the information at hand. The standard does not require parents to be educators or legal scholars. The clock does not run from when parents come to understand their legal rights. Instead, the clock runs from when reasonable parents are able to conclude that their child's needs are unmet.

### The Burden of Proof

The burden of proof, generally, consists of two elements: the burden of production and the burden of persuasion. In special education due process hearings, the burden of persuasion lies with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 392 (3d Cir. 2006). The party seeking relief must prove entitlement to their demand by preponderant evidence and cannot prevail if the evidence rests in equipoise. *See N.M., ex rel. M.M. v. The School Dist. of Philadelphia*, 394 Fed.Appx. 920, 922 (3rd Cir. 2010), citing S*hore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). In this particular case, the Parent the party seeking relief and must bear the burden of persuasion.

I accept the District's argument that the Parents continue to bear the burden of persuasion.[1] The case law cited by the District is compelling. The IDEA's statute of limitations is an affirmative defense. The District had the burden to raise that defense and establish its applicability in this

---

[1] The Parents make no argument to the contrary.

case. *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 487 (3d Cir. 1985). Having done that, the burden shifts back to the Parents to establish the KOSHK date for each alleged violation. *Debiec v. Cabot Corp.*, 352 F.3d 117, 129 (3d Cir. 2003) *Van Buskirk*, 760 F.2d at 487, *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 626 (3d Cir. 2015).

## Analysis

I will now examine each alleged violation and determine the KOSHK date for each violation. The District argues that the Parents have failed to specifically delineate violations in their complaint, at the hearing, or in their brief. The Parents could have been more specific, but I turn to the complaint to determine what violations are plead for each school year in question.

For clarity, I am not considering whether evidence substantiates any alleged violation. I am considering only what actions and violations are plead, and evidence regarding the Parents' knowledge of those actions and violations under the standard discussed above.

### 2014-15 School Year – Alleged Actions

The complaint is fairly read to allege the following actions during the 2014-15 school year:

1. The Student's most recent reevaluation report (RR) is dated May 28, 2015.
2. The RR found that the Student has average cognitive functioning.
3. The RR concluded that the Student is a child with an Other Health Impairment (OHI) and, secondarily, a Speech and Language Impairment (SLI).
4. The Student received special education via an Individualized Education Program (IEP) throughout the 2014-15 school year.[2]
5. The District failed to consistently implement the Student's IEP.

### 2014-15 School Year – Alleged Violations

The complaint is fairly read to allege the following violations during the 2014-15 school year:

1. The RR failed to evaluate all of the Student's suspected areas of disability.
2. The IEP failed to address all of the Student's areas of need, particularly regarding the Student's deficits in reading comprehension, reading fluency, executive functioning, coping skills for anxiety, and language skills.
3. The IEP failed to provide sufficient supports and services to address the Student's needs and behaviors.
4. The Student was entitled to, but the District did not offer, ESY services in the summer of 2015.[3]

---

[2] This fact is not specifically alleged but is reasonably inferred by the complaint itself. Moreover, there is no dispute about when the Student received IEPs or the content of those IEPs.
[3] No facts are specifically alleged regarding ESY.

## 2014-15 School Year – Findings of Fact

1. The Student started the 2014-15 school year under an IEP dated June 4, 2014. That IEP expired on June 3, 2015 (the 2014 IEP). P-2.
2. The Parents attended an IEP team meeting on June 4, 2014 and approved the 2014 IEP via a Notice of Recommended Educational Placement the same day. P-2.
3. The 2014 IEP called for an itinerant amount of speech and language support. P-2.
4. The 2014 IEP states that the Student does not exhibit behaviors that impede the Student's learning or that of others. However, the IEP also states that the Student is diagnosed with ADHD, takes medication for ADHD, and receives specially-designed instruction to support focus in the academic setting. P-2.
5. Teacher input in the 2014 IEP relates concerns about the Student's ability to focus and need for prompting. P-2.
6. The 2014 IEP includes statements of the Student's progress with speech articulation, ability to formulate complete thoughts in speech, and ability to follow multi-step directions. P-2.
7. The 2014 IEP included three goals: one targeting the Student's ability to follow multi-step directions, one targeting the Student's ability to "relate a personal experience with a topic sentence and at least two details,"[4] and one targeting the Student's ability to verbally support responses to classroom prompts. P-2.
8. The 2014 IEP included a modest amount of basic Specially Designed Instruction such as preferential seating, comprehension checks, and extra time on assignments. P-2.
9. The 2014 IEP included "small group instruction for speech therapy" provided in the "speech therapy room and various academic settings" to occur "during speech language therapy." P-2 at 16. The 2014 IEP was, however, silent as to the frequency or duration of speech and language therapy the Student was to receive. If accurate, PENNDATA reporting incorporated into the IEP shows that the Student was to spend 6.3 out of 6.5 hours of the school day in the regular education classroom. P-2 at 20. I do *not* take this to mean that the Student was to spend 12 minutes per day in the speech therapy room.
10. The 2014 IEP found the Student ineligible for ESY in the summer of 2014. The 2014 IEP says that data collected after school breaks did not show regression, and ESY was denied on that basis. P-2.
11. In December of 2014, the Parents and District exchanged emails. The Parents conveyed the Student's concern about falling behind in writing because the Student went to the speech therapy room while other Student received writing instruction. The Parents were also concerned about the Student's off-task behaviors. The District shared information about the Student's progress in speech therapy, and both parties agreed to an informal assessment of the Student's behaviors. S-21.
12. On December 10, 2014, the District proposed a reevaluation by sending the Parents a Permission to Reevaluate – Consent Form (2014 PTRE). The concern at the time, printed on the form, was the Student's ability to follow directions and complete work timely in class. The District proposed several types of assessments, including observations and behavior rating scales.

---

[4] It is unclear if the Student was to speak a sentence or write a sentence but, in context, the former is likely.

13. The Parents modified the PTRE form to include cognitive and academic assessments, initialed their changes, signed the form to give consent for the evaluation, and returned the form to the District on December 11, 2014. S-22.
14. On February 13, 2015, the District sent an email to the Parents apologizing for some confusion or delay in sending parental input forms for the evaluation. The District expressed its intention to examine the Student's academic needs in general and writing skills in particular. The District also confirmed that the Parents consented to additional time to complete the evaluation. S-24.
15. Around February 17, 2015, the Student's classroom teacher changed. The Parents contacted the new teachers to introduce themselves and share information about the Student. The Parents shared the Student's ADHD diagnosis, medications, and private therapy status. The Parents also shared that the Student was keeping up academically, except for trouble with a recent writing assignment. The Parents explanted that the Student could become anxious about school work and explained previous strategies. S-23.
16. On March 9, 2015, the District completed the reevaluation report (2015 RR). Parental input in the 2015 RR included the Parents' observations that the Student was sometime impulsive, hyperactive, and disobedient. The Parents also reported behavioral concerns as a recent development. The Student was having difficulty following directions and initiating homework. The Parents also reported sensitivity and inflexibility. The Parents were also concerned about the Student's organizational skills, ability to follow daily routines, ability to organize thoughts for writing, and school-related anxiety. S-25.
17. The 2015 RR included standardized, normative cognitive and achievement tests. Those tests found that the Student had average intellectual ability (although working memory and processing speed were "low average"), and average to above average math, reading, and spelling scores. However, the 2015 RR noted very poor scores on curriculum-based writing assignments. Those scores are inconsistent with "proficient" marks on report cards. S-25.
18. The 2015 RR also included a classroom observation and behavior rating scales completed by the Parents and a teacher. The observation found that the Student showed appropriate behavior in the classroom but was inattentive and easily districted. Consistent with the observation, rating scales indicated elevated risk for attention problems and hyperactivity in school. Teacher rating scales also placed the Student in the "at risk" range for anxiety. The 2015 RR recommended continuation of the services already provided through the 2014 IEP to address these problems. S-25.
19. The 2015 RR also included a speech and language assessment. The Student scored in the average range on language assessments, but speech therapy was recommended to continue to address articulation issues. S-25.
20. The 2015 RR concluded that the Student continued to qualify for special education as a child with a speech or language impairment without a secondary disability category. S-25.
21. On April 1, 2015, the District sought the Parents' consent to reevaluate the Student. The reason for the request, as stated on the consent form, was to assess additional data concerning the Student's progress in the writing curriculum. S-28.
22. On April 5, 2015, the Parents wrote to the District to express concerns about the 2015 RR. They noted that another child's name was printed in various places within the 2015

RR. The Parents were also concerned that standardized writing assessments did not measure the same skills assessed in the curriculum-based assessments. The Parents were also confused by the discrepancies between scores on writing assignments and report cards. In sum, the Parents expressed that the 2015 RR over-estimated the Student's writing ability, under-estimated the Student's ADHD symptoms and anxiety, and failed to link the two. S-29.
23. In the April 5, 2015 email, the Parents explicitly stated their belief that the Student should be "diagnosed" as a child with OHI. S-29.
24. On April 9, 2015, the Student's IEP team reconvened. S-27. The District offered an IEP the same day (the 2015 IEP). S-31. The Parents also accepted the 2015 IEP the same day with a NOREP. S-32.
25. The 2015 IEP included a summary of the 2015 RR. S-31.
26. The 2015 IEP included one goal: for the Student to produce the /r/ sound with 90% accuracy. S-31.
27. The modifications and SDI in the 2015 IEP were identical in substance to the 2014 IEP except for "use of organizational strategies" prior to writing assignments. S-31.
28. The 2015 IEP calls for the Student to spend 6.4 of 6.5 hours in the regular education classroom (up from 6.3 hours in the 2014 IEP) but is similarly silent about what type or how much speech and language therapy the Student will receive.
29. The 2015 IEP finds that the Student did not qualify for ESY services in the summer of 2015 based on a lack of data suggesting problems with regression or recoupment.
30. On April 10, 2015, the Parents wrote to the District to express their satisfaction with the Student's progress and the April 9 IEP meeting. S-33.
31. On May 28, 2015, the District issued an update to the 2015 RR (2nd 2015 RR). The District specifically considered whether the Student qualified for special education as a child with OHI. The 2nd 2015 RR conclude that the Student is a child with OHI. The 2nd 2015 RR recommended continuation of strategies that were already in place at the time both thorough the 2015 IEP and through the Student's teacher's good teaching practices. S-35.
32. On June 3, 2015, the IEP team reconvened, and the District issued a revised IEP (Revised 2015 IEP). The Revised 2015 IEP included some changes to the Student's present education levels to highlight the Student's writing difficulties and added a paragraph writing goal. S-37.
33. The Revised 2015 IEP calls for the Student to spend 6.0 of 6.5 hours in the regular education classroom (down from 6.4 hours in the 2015 IEP) but is similarly silent about what type or how much speech and language therapy the Student will receive. S-37
34. The Parents approved the Revised 2015 IEP via a NOREP on June 3, 2015. S-38.

**2014-15 School Year – Analysis**

The evidence in this case establishes that the Parents knew of the District's actions during the 2014-15 school year contemporaneously with their occurrences. The record does not reveal a delay between the completion of any evaluation or IEP, and transmission of those documents to the Parents. Rather, the evidence establishes that the Parents were diligent, communicated with the District, and were involved in educational decision-making processes.

More specifically, I find that the KOSHK date for the claim that the 2015 RR or 2nd 2015 RR failed to evaluate all suspected areas of disability are March 9, 2015 and May 28, 2015, respectively. Upon receipt of the 2015 RR, the Parents wrote to express their concerns about the comprehensiveness of the evaluation. The 2nd 2015 RR was completed in response to that concern. The Parents (or any reasonably diligent parent) were in a position determine whether the 2nd 2015 RR corrected the concerns they raised after receiving the 2015 RR. Consequently, claims concerning the appropriateness of the 2015 RR and 2nd 2015 RR are untimely.

The same analysis applies for the 2014, 2015, and Revised 2015 IEPs. The Parents expressed concerns about the Student's abilities while 2014 IEP was being implemented and the 2015 IEP was being developed. The Parents were concerned about the Student's writing abilities, ADHD symptoms, and anxiety throughout the 2014-15 school year. The Parents knew what services the IEPs did and did not offer at the time they were issued, were in a position to raise concerns about the Student's needs, and actually did so.

It is important to note that the Parents do not claim either statutory exception to the IDEA's statute of limitations. It appears that the Parents expressed concerns about the Student's writing abilities, ADHD symptoms, and anxiety prior to the IEP team meeting, received an IEP that does very little along those lines, and they wrote to the District in praise of the District's efforts. If the District made misrepresentations about solving a problem, and those misrepresentations caused the delay in requesting this hearing, the statute of limitations would not apply. 20 U.S.C. § 1415(f)(3)(D), see *D.K. v. Abington Sch. Dist.*, 696 F.3d 233 (3d Cir. Pa. 2012); *P.P. ex rel. Michael P. v. West Chester Area School Dist.*, 585 F.3d 727, 730 (3rd Cir., 2009). The Parents make no such claim. They say that they did not know about the District's actions or the alleged violations – not that they were duped.

It is also important to note that the Parents allege deficiencies in the IEPs related to the Student's *reading* and writing ability. During the 2014-15 school year, the Parents expressed concerns about the Student's *writing* ability. That distinction does not change the result in this case. The evidence demonstrates that the Parents wanted a clear picture of the Student's overall academic abilities, pushed the District towards comprehensive evaluations, received information about the Student's reading abilities as measured by both standardized tests and curriculum-based assessments, and were aware that the IEPs did not target reading specifically.

In the absence of alleged misrepresentations, the Parents knew or should have known about the District's actions and violations concerning the 2014, 2015, and Revised 2015 IEPs when they received the Revised 2015 IEP on June 3, 2015 at the latest. By that point in time, they had expressed concerns in writing to the District that were not addressed in the IEPs. Claims concerning the appropriateness of those IEPs are untimely for that reason.

Regarding IEP implementation failures, the Parents allege that the District did not consistently provide the speech therapy that was promised in the IEPs. The vagueness of each IEP concerning the amount of speech therapy that the Student was supposed to receive complicates this issue. My task is to determine when the Parents knew that the Student did not receive an unspecified amount of speech therapy. The District should not benefit from this vagueness. Nevertheless, in the absence of alleged misrepresentations, the Parents are obliged to put forward some evidence

to established what they learned about missing speech therapy, and when they learned it. After a hearing on this issue, I must conclude that the Parents failed to satisfy this burden.

Almost no evidence was presented to establish when the Parents knew or should have known that the Student was entitled to but did not receive ESY in the summer of 2015. Both the 2014 and 2015 IEPs state that the Student did not qualify for ESY. Consequently, the Parents knew of the District's action (denying ESY) by April 9, 2015. The Parents have not established that their knowledge of the violation (that the Student was entitled to ESY) came at a later date. Claims regarding ESY in the summer of 2015 are untimely for that reason.

### 2015-16 School Year Through January 2, 2016

As noted above, the complaint does not specifically delineate what alleged violations occurred over discrete periods of time. The complaint can be fairly read to allege the same violations from the 2014-15 school year through the entire time covered in the compliant. Evidence concerning actions and violations from the start of the 2015-16 school year through January 2, 2016 is, however, more straightforward.

Reading the complaint in the light most favorable to the Parents, they claim that all evaluations conducted and IEPs issued from the start of the 2015-16 school year through January 2, 2016 were inappropriate for the same reasons that IEPs and evaluations issued during the 2014-15 school year were appropriate. However, the District did not evaluate the Student during this period of time, and no new IEPs were issued.

Regarding evaluations, as indicated in the complaint, the 2nd 2015 RR was the Student's last RR.

Regarding IEPs, the Student started the 2015-16 school year under the Revised 2015 IEP. The District did not offer another IEP until May 12, 2016.

At risk of over-reiteration, I note again that I am not judging the appropriateness of Revised 2015 IEP. I am only evaluating when the Parents knew, or had reason to know, that the Revised 2015 IEP failed to address all of the Student's needs and failed to provide appropriate special education for the needs that were addressed. That analysis is no different than the analysis for the 2014-15 school year. Evidence demonstrates that the Parents were aware of the Student's needs, pushed the District to consider those needs, but ultimately accepted an IEP that did not address those needs. The KOSHK date for claims regarding the IEP in place from the start of the 2015-16 school year through January 2, 2016, is June 3, 2015. Consequently, those claims are untimely.

Analysis regarding IEP implementation from the start of the 2015-16 school year through January 2, 2016 is the same as in the 2014-15 school year.

## Conclusions

For reasons discussed above, claims raised in the Parent's complaint accruing before January 2, 2016 are untimely. Under the unique facts of this case, and in the absence alleged misrepresentations, there was no delay between the moment that the Parents became aware of the District's actions, and when they became aware of the alleged violations. The violations raised in the complaint are consistent with concerns that the Parents expressed contemporaneously with the District's actions. To the extent that the violations include implementation failures, I do not find that the Parents knew or hand reason to know of those actions (technically, inactions) as the occurred. Rather, I find that the Parents did not produce evidence about when they came to know that the actions occurred.

## ORDER

And now, May 3, 2018, the District's motion to dismiss all claims arising before January 2, 2016 as untimely is GRANTED.

/s/ Brian Jason Ford
HEARING OFFICER