# Pennsylvania Special Education Due Process Hearing Officer

## Final Decision and Order
## ODR No. 20099-1718KE
## CLOSED/OPEN HEARING

**Child's Name:**
Zachary J———

**Date of Birth:**
[redacted]

**Dates of Hearing:**
04/06/2018, 08/02/2018, 10/01/2018, 10/12/2018

**Date of Decision:**
11/16/2018

**Parent:**
Jonathan J———, Jennifer J———
[redacted]
Lafayette Hill, PA 19444

**Counsel for Parent:**
Michael J. Connolly, Esq.
McAndrews Law Offices, P.C.
30 Cassatt Avenue
Berwyn, PA 19312

**Local Education Agency:**
Colonial School District
230 Flourtown Road
Plymouth Meeting, PA 19462

**Counsel for the LEA:**
Karl A. Romberger, Jr., Esq.
Sweet, Stevens, Katz & Williams, LLP
331 Butler Avenue, P.O. Box 5069
New Britain, PA 18901

**Hearing Officer:**
Brian Jason Ford, JD, CHO

EXHIBIT B

## Introduction and Procedural History

This matter concerns the educational rights of the Student,[1] who is a child with disabilities as defined by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. The Student's parents (the Parents) requested this hearing against the Student's School District (the District). The Parents claim that the District violated the Student's right to a free, appropriate public education (FAPE) from the 2014-15 school year through the 2016-17 school year. The Parents demand compensatory education to remedy that alleged denial. The Parents also claim that the District failed to offer an Individualized Education Plan (IEP) reasonably calculated to provide a FAPE for the 2017-18 school year. The Parents placed the Student in a private school for the 2017-18 school year and demand tuition reimbursement. The District disputes these claims and argues that it provided or offered a FAPE at all times.

The hearing was requested on January 2, 2018. The District moved to dismiss claims arising before January 2, 2016, as untimely. After some scheduling motions, a hearing session convened on April 6, 2018 to resolve the District's motion. After the hearing and briefing, I issued a Pre-Hearing Order on May 3, 2018, granting the District's motion.

Additional hearing sessions were then scheduled and ultimately rescheduled to August 2, 2018. Additional rescheduling was necessary so that that counsel could address unfortunate personal circumstances. Both attorneys and their clients are commended for being flexible, understanding, and accommodating. The hearing ultimately reconvened on October 1 and concluded on October 12, 2018.

## Issues

Following the May 2, 2018 Pre-Hearing Order, the issues in this case are:

1. Did the Student receive a FAPE from January 2, 2016 through the end of the 2016-17 school year? If so, is the Student owed compensatory education?

2. Are the Parents entitled to tuition reimbursement for the 2017-18 school year?

## Findings of Fact

All evidence, both the documents entered as evidence and testimony, was carefully considered. This does not mean that I assigned the same weight to all evidence, as discussed below. Moreover, I make findings of fact only as necessary to resolve the issues before me. Consequently, not all evidence is cited herein.

I find as follows:

---

[1] Except for the cover page of this decision and order, identifying information is omitted to the greatest extent possible.

**Background**

1. Before May 2015, the Student was identified as a child with a Speech or Language Impairment (SLI). Before June 2015, the Student's IEP included one goal addressing articulation of the /r/ sound.

2. The District conducted a reevaluation, and wrote a reevaluation report (RR) for the student. The RR was completed on May 28, 2015 (the 2015 RR). The evaluation team concluded in the 2015 RR that the Student primarily qualified for special education as a child with an Other Health Impairment (OHI) as a result of ADHD symptoms. P-7.

3. At the time of the 2015 RR, the educators working with the Student noted some problems with reading and writing. Generally, the educators attributed the Student's academic difficulties to the Student's attentional problems (a difficulty focusing on reading and writing as opposed to an inability to read or write). *See* P-7.

4. The Student's IEP team convened on June 3, 2015, and used the 2015 RR to revise the Student's IEP. The resulting IEP (the 2015 IEP) included two goals: the speech articulation goal from the prior IEP and a paragraph writing goal. The paragraph writing goal called for the Student to complete a five-sentence paragraph in response to a prompt. The paragraph was then scored using a writing rubric. A baseline was to be established in November 2015 after three paragraphs were analyzed. P-8

5. To enable the Student to accomplish the goals in the 2015 IEP, the District specified the modifications and specially designed instruction (SDI) that the Student received. Of the eight modifications and SDI, seven related to the Student's attention. Examples include extra time to complete tasks, and frequent check-ins to assess the Student's comprehension. The remaining SDI was related to the Student's articulation. P-8

6. The 2015 IEP called for the Student to receive 90 minutes of Speech and Language Therapy (S/LT) per month in a small group as a related service. The related services section of the IEP does not specify if the S/LT was to be provided one-to-one or in a group but, read together with the modifications and SDI, the IEP called for small group instruction. P-8.

7. The Parents approved the 2015 IEP on June 3, 2015 via a Notice of Recommended Educational Placement (NOREP). P-8.

**The 2015-16 School Year (3rd Grade)**

8. The Student started the 2015-16 school year (3rd grade) under the 2015 IEP. P-8. The 2015 IEP was in place through May 2016. P-9.

9. For the 2015-16 school year, the Student was placed in a co-taught regular education classroom. This means that the Student's classroom was a regular education classroom, and all children attending that classroom received instruction from both a regular education teacher and a special education teacher. NT 181.

10. During the 2015-16 school year, the Student received instruction in written expression in a learning support classroom. Students who were not removed from the co-taught regular education classroom received writing instruction at the same time. NT 182, 185, 452.

11. During the 2015-16 school year, the Student received all other academic instruction in the regular education co-taught classroom. NT 182, 212-213.

12. The District reported the Student's progress towards IEP goals.[2] Regarding the writing goal, the Student's written paragraphs were scored using a rubric on which the Student could earn a maximum of eight points per prompt. One paragraph was scored in September 2015 (4 points), and two were scored in November 2015 (both 8 points), creating the baseline as required by the goal. The District then collected and scored paragraphs in January (7 points), February (8 points), March (8 points), and April (6 points). S-60.

13. The District also sent a written narrative explaining the reports of progress. These reports explain what topic the Student wrote about, how the Student earned and lost points, and the extent to which the Student worked without teacher assistance. For the most part, the Student wrote the paragraphs without assistance. S-60.

14. Consistent with the 2015 RR, the Student's 3rd grade teachers noted that the Student's attention issues negatively impacted upon the Student's reading comprehension. *See, e.g.* NT 214.

15. With the exception of reading, the Student's academic progress was measured using curriculum-based assessments and reported on report cards – the same as regular education students. The Student was found to be proficient in most academic domains, and partly proficient in others throughout the 2016-17 school year. S-81.

---

[2] The District also reported the Student's progress toward the speech articulation goal. The appropriateness of the Student's articulation instruction is not truly an issue in this hearing. The Parents make a brief, passing reference to speech therapy and the articulation goal both in their complaint and in their closing statement. The Student's progress reports from speech therapy were also entered into evidence with other IEP progress reporting. The therapist, however, was not called as a witness. The only issue about speech therapy raised in the complaint was whether the Student received the amount of therapy called for in the IEP. No evidence on that point was presented. Moreover, the Parents seek no remedy in relation to speech articulation. Their demand for compensatory education is not based on the Student's ability to produce the /r/ sound, and they did not place the Student into a private school to secure speech articulation therapy.

16. According to the Student's report card, the Student's progress towards reading was assessed using the IEP. S-81. The IEP did not have a reading goal. P-8. However, the Student was "approaching" end-of-year grade level expectations by the end of 3rd grade. S-81.

17. The report card also listed a number of skills under the heading "Social and Work Skills Development." For each domain, the teacher could mark the Student "consistently meets expectations," "progressing," or "does not meet expectations." The Student was marked as "progressing" in all domains in all marking periods except for "stays on task" and "demonstrates organizational skills." The Student was marked "does not meet expectations" in those domains across all marking periods. S-81.

18. The Student had no disciplinary incidents in 3rd grade. However, there is no dispute that the Student had difficulty with distractibility, focus, and off-task behaviors. Those difficulties were not consistent throughout the school year. Rather, there was some variability as the Student's medications changed during the school year. NT 231-232, 237, 293. By mid-year, the Student's behaviors and medications had stabilized. This does not mean that the Student had no problems with attention. Rather, the problems followed a predictable pattern. *See also* S-53.

19. The IEP team met again on May 12, 2016, for an annual IEP team meeting. The team updated the 2015 IEP and issued an updated IEP the same day as the meeting (the 2016 IEP). P-9.

20. Compared to the 2015 IEP, there are two substantive changes in the 2016 IEP. First, the Student's present education levels were updated to reflect the Student's progress during the 2015-16 school year to that point. Second, an SDI providing non-verbal (visual or gestural) cues was edited slightly. In the 2015 IEP, the purpose of the cues was to support the Student's attention to instruction. In the 2016 IEP, the purpose was both to attend to instruction and to "decrease verbal impassivity" - meaning calling out. All other substantive aspects of the 2015 IEP and 2016 IEP, including goals, are identical. *C/f* P-8, P-9.

21. The Student was promoted to 4th grade at the end of the 2015-16 school year.

**The 2016-17 School Year (4th Grade)**

22. The Student started the 2017-18 school year (4th grade) under the 2016 IEP.

23. The District placed the Student in a regular education classroom during the 2016-17 school year. That classroom was not co-taught. The Student received all academic instruction in the regular education classroom except as noted. NT *passim*.

24. The Student received supplemental small group Language Arts instruction from a special education teacher for about 60 minutes per day. *See, e.g.* NT 263, 346. The children who remained in the regular education classroom also received small group

Language Arts instruction at the same time. NT 265-265. The Student also received large group Language Arts instruction in the regular education classroom from the regular education teacher. NT 266.[3]

25. The 4th grade special education teacher monitored the Student's progress towards the IEP writing goal. Without changing the IEP, the special education teacher changed the writing goal. The special education teacher assessed the Student's writing using 4th grade standards. The Student was now expected to write five paragraph essays. The special education teacher told the Parents about the change, and the Parents did not object to it. NT 271.

26. The Student's medications changed during the 2016-17 school year, and the Student's behaviors were more variable. The IEP team met mid-year (January or February 2017) to discuss the Student's medication and behavioral changes, but did not update the IEP. NT 281, 310.

27. During the mid-year meeting, the team discussed a behavioral chart that was causing the Student some anxiety. The team also talked about how the Student's behaviors, particularly the Student's impulsivity, were leading to negative peer interactions. *See* NT 309. The District informally offered an Occupational Therapy (OT) evaluation and placement in a social skills group. The Parents rejected both. NT 309-310.

28. During the mid-year meeting, the team also discussed obtaining a neuropsychological evaluation for the Student. The District explained that it could complete a neuropsychological evaluation with its own evaluator, but the Parents expressed a preference for obtaining an outside evaluator.

29. Before the mid-year meeting, in November 2016, the Student expressed suicidal thoughts to the Parents. NT 38. This prompted the Parents to contact a private psychologist to obtain a neuropsychological evaluation. The Parents contacted the private psychologist in November or December 2016, before the mid-year meeting with the District. NT 390.

30. Parents hired the private psychologist. Their intake meeting was held on February 28, 2017. The private psychologist tested the Student on February 20 and 22, and the private psychologist's associate observed the Student in school on March 23, 2017. P-12. The private psychologist then issued a neuropsychological evaluation report on May 11, 2017. P-12. The neuropsychological evaluation is described below.

31. The District scheduled an annual IEP team meeting for May 11, 2017. The District postponed the meeting at the Parents' request. The meeting ultimately convened on May 19, 2017. The Parents provided a copy of the neuropsychological

---

[3] The Student also received S/LT but, again, that is not an issue in this case.

evaluation report to the District the day before the meeting. *See* NT 122, 283, 285-286.

32. The IEP team reviewed the neuropsychological evaluation and the Student's IEP at the May 19, 2017 meeting. The neuropsychological evaluation was not discussed in detail, as the District had just received it. NT *passim.*

33. The team also revised the Student's IEP (2017 IEP). Primarily, the Student's writing goal was changed to reflect the five-paragraph writing assessments already being done by the 4th grade special education teacher. P-11.

34. The 2017 IEP also included revisions to the SDI and modifications that the Student would receive. In the context of this case, the revisions were not substantive. Rather, they formalized many of the good teaching practices that were already in place, and stated some prior SDI more explicitly. C/f P-9, P-11.

35. The 2017 IEP was presented to the Parents with a NOREP on May 11, 2017. The Parents rejected the NOREP on June 12, 2017. P-11.

36. Before rejecting the NOREP, the Parents looked into a private school for the Student (the Private School). The Private School accepted the Student in June 2017.

37. After receiving the rejected NOREP, the District reconvened the Student's IEP team on July 13, 2017. The District brought a revised draft IEP to the meeting, and the team discussed the proposed revisions (Revised 2017 IEP). P-13.

38. The primary difference between the 2017 IEP and the Revised 2017 IEP is the inclusion of direct instruction of executive functioning skills in a small group 2 to 3 times per week. *C/f* P-11, P-13

39. The District issued the Revised 2017 IEP with a NOREP. The Parents rejected the NOREP and returned it to the District on August 18, 2017. P-13. The Parents provided written notice to the District of their intent to place the Student in the Private School and seek tuition reimbursement the same day. P-23 at 75.

40. The Student's end-of-year report card for the 2016-17 school year was much like the 2015-16 report card. The Student was marked proficient in most academic subjects, partly proficient in others, and advanced in a few. Similarly, the Student was either "progressing" or "meets expectations" in all social and work skills development domains. The Student was promoted to 5th grade. S-81.

41. The District also tracked the Student's progress towards the (unwritten) five-paragraph writing goal. As scored against grade-level standards, the Student consistently met the expectations established in the IEP. However, narrative comments reported with the Student's numerical score explained that the task was difficult or "overwhelming" for the Student. To be clear, the Student's ability to write a five-paragraph paper improved meaningfully over the school year, but the Student still required assistance to meet this goal by the end of the year. S-80.

42. As in the prior school year, the 4th grade teachers attributed the Student's difficulties in writing to the Student's ADHD symptoms, as opposed to a writing disability in and of itself. NT *passim*.

## Legal Principles

**The Burden of Proof**

The burden of proof, generally, consists of two elements: the burden of production and the burden of persuasion. In special education due process hearings, the burden of persuasion lies with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 392 (3d Cir. 2006). The party seeking relief must prove entitlement to their demand by preponderant evidence and cannot prevail if the evidence rests in equipoise. *See N.M., ex rel. M.M. v. The School Dist. of Philadelphia*, 394 Fed.Appx. 920, 922 (3rd Cir. 2010), citing S*hore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). In this particular case, the Parent the party seeking relief and must bear the burden of persuasion.

**Free Appropriate Public Education (FAPE)**

The IDEA requires the states to provide a "free appropriate public education" to all students who qualify for special education services. 20 U.S.C. §1412. Local education agencies, including school districts, meet the obligation of providing a FAPE to eligible students through development and implementation of IEPs, which must be "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Mary Courtney T. v. School District of Philadelphia*, 575 F.3d 235, 240 (3d Cir. 2009) (citations omitted). Substantively, the IEP must be responsive to each child's individual educational needs. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.324.

This long-standing Third Circuit standard was confirmed by the United States Supreme Court in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). The *Endrew F.* case was the Court's first consideration of the substantive FAPE standard since *Board of Educ. of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982).

In *Rowley*, the Court found that a LEA satisfies its FAPE obligation to a child with a disability when "the individualized educational program developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." Id at 3015.

Historically in the Third Circuit has interpreted *Rowley* to mean that the "benefits" to the child must be meaningful, and the meaningfulness of the educational benefit is relative to the child's potential. *See T.R. v. Kingwood Township Board of Education*, 205 F.3d 572 (3rd Cir 2000); *Ridgewood Bd. of Education v. N.E.*, 172 F.3d 238 (3rd Cir. 1999); *S.H. v. Newark*, 336 F.3d 260 (3rd Cir. 2003).

Under the historical meaningful benefit standard, a school district is not required to maximize a child's opportunity; it must provide a basic floor of opportunity. See *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290 (7th Cir.), *cert. denied*, 488 U.S. 925 (1988). However, the meaningful benefit standard required LEAs to provide more than "trivial" or "*de minimus*" benefit. See *Polk v. Central Susquehanna Intermediate Unit* 16, 853 F.2d 171, 1179 (3d Cir. 1998), *cert. denied* 488 U.S. 1030 (1989). See also *Carlisle Area School v. Scott P.*, 62 F.3d 520, 533-34 (3d Cir. 1995). It is well-established that an eligible student is not entitled to the best possible program, to the type of program preferred by a parent, or to a guaranteed outcome in terms of a specific level of achievement. See, *e.g., J.L. v. North Penn School District*, 2011 WL 601621 (E.D. Pa. 2011). Thus, what the statute guarantees is an "appropriate" education, "not one that provides everything that might be thought desirable by 'loving parents.'" *Tucker v. Bayshore Union Free School District*, 873 F.2d 563, 567 (2d Cir. 1989).

In *Endrew F.*, the Supreme Court effectively agreed with the Third Circuit by rejecting a "merely more than *de minimus*" standard, holding instead that the "IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. 988, 1001 (2017). Appropriate progress, in turn, must be "appropriately ambitious in light of [the child's] circumstances." Id at 1000. In terms of academic progress, grade-to-grade advancement may be "appropriately ambitious" for students capable of grade-level work. Id. Education, however, encompasses much more than academics — as is clearly evident in this case.

The essence of the standard is that IDEA-eligible students must receive specially designed instruction and related services, by and through an IEP that is reasonably calculated at the time it is issued to offer an appropriately ambitious education in light of the Student's circumstances.

**Tuition Reimbursement**

To determine whether parents are entitled to reimbursement from their school district for special education services provided to an eligible child at their own expense, a three part test
is applied based upon Burlington School Committee v. Department of Education *of Massachusetts*, 471 U.S. 359 (1985) and *Florence County School District v. Carter*, 510 U.S. 7 (1993). This is referred to as the *"Burlington-Carter"* test.

The first step is to determine whether the program and placement offered by the LEA is appropriate for the child. The second step is to determine whether the program obtained by the parents is appropriate for the child. The third step is to determine whether there are equitable considerations that counsel against reimbursement or affect the amount thereof. *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3rd Cir. 2007). The steps are taken in sequence, and the analysis ends if any step is not satisfied.

**Credibility / Weight of Evidence**

All witnesses testified credibly in the sense that there was no indication that any witness was untruthful. This does not mean, however, that I assign equal weight to all evidence and testimony.

The neuropsychological report was problematic. Neuropsychological testing, like any other form of testing that uses standardized assessments, requires the evaluator to both obtain test scores and then interpret those scores. The numbers by themselves say very little about a child, or how to educate a child. The evaluator's task is to put the scores into context and then make programatic recommendations.

In this case, the Student's teachers all consistently observed the Student display behaviors commonly associated with ADHD. There is no dispute in this case that the Student has difficulties with attention and focus, and that those difficulties are attributable to the Student's ADHD. Despite those ADHD symptoms, the Student's academic performance in school was strong in most domains. To the extent that the Student had academic difficulties, the teachers linked those problems to the Student's attention and focus. Their opinion, that the Student's writing was negatively affected by the Student's attention and focus, was well-supported by their experienced observations and prior testing. The private psychologist never inquired about the teacher's perspective. Instead the private psychologist made assumptions about how the teachers provided instruction to the Students — many of them inaccurate — and made recommendations based on those assumptions.[4] The private psychologist's failure to ask the Student's teachers anything at all about the Student's program, instead relying only upon information from the Parents, is perplexing.[5]

In the report itself, the private psychologist did not adequately address how the Student's attention and focus problems may have impacted upon the Student's testing. This was addressed through the private evaluator's testimony. The Student's attention and focus may have brought down the Student's test scores. NT 625. Despite this potential depression in test scores, the private psychologist found that the Student had average intelligence, above average reading ability, and average math skills. Like the District, the evaluator found problems with writing, reading comprehension, attention and focus. The evaluator also found problems with the Student's executive functioning. In short, the neuropsychological report did not reveal much information that the District did not already know. Further, the recommendations flowing from the report very closely tracked programs that were already in place for the Student.

---

[4] The private psychologist's understanding of the Student's program, which was based on assumptions, was considerably different from the teacher's descriptions of the Student's program. *See, e.g.* NT 523, 553, 565, 578, 581, 650.

[5] The private psychologist did ask teachers to complete behavior rating scales, which only revealed information that was already generally accepted about the Student.

Despite all of the foregoing, the private psychologist opined that the Student did not receive a FAPE from the District, and that the Student required placement in the private school. Again, some of this flows from the private psychologist's misunderstanding of the District's programs. The private psychologist never adequately addressed or refuted the District's overall conclusions that the Student's reading comprehension and writing ability would improve as the Student's attention and focus improved. More importantly, the private psychologist never addressed the Student's strong academic performance. There is no doubt that the Student has problems with attention and focus. It is also more likely than not that the Student has executive functioning needs. Yet the Student was able to succeed with the supports that the District provided. The private psychologist was either unaware of this fact, or did not incorporate it into her analysis. Consequently, I give the recommendations in the neuropsychological report very little weight.

## Discussion

**Provision of FAPE - January 2016 to End of the 2015-16 School Year (3rd Grade)**

The District provided a FAPE to the Student between January 2016 and the end of the 2015-16 school year (3rd grade).

The District provided the services that the Student required to progress academically. Consequently, the Student completed the 3rd grade curriculum, earning passing marks in all subjects. Importantly, the 3rd grade regular education curriculum was not modified for the Student. Rather, the Student received only a combination of small group instruction for writing and good teaching practices in a co-taught regular education classroom.

There is no preponderant evidence that the Student's proficient marks were unearned. Rather, the record supports a determination that the Student's performance on certain reading tasks – reading comprehension in particular – were hindered by the Student's ADHD symptoms. The District provided the necessary accommodations for the Student to make meaningful progress in reading throughout 3rd grade. The Student's progress is shown by the Student's performance on an IEP goal and by the Student's advancement through the 3rd grade curriculum.

Generally, actual progress is not evidence of the appropriateness of an IEP at the time it was offered. To judge an IEP by a student's actual progress once the IEP is in place is to indulge in the type of Monday morning quarterbacking that IDEA jurisprudence properly restricts. Rather, actual progress is a good way to determine if an IEP is working as expected. LEAs have a continuing obligation to ensure the provision of FAPE, and so LEAs must take action when data indicates stagnation or regression. All of the evidence in this case substantiates that the Student made meaningful progress during 3rd grade. No data collected at that time indicates that the District should have proposed changes to the Student's IEP between January 2016 and the end of the 3rd grade school year.

The same is true for evaluations. The District would have been obligated to propose new or different evaluations under either of two circumstances: if the District had reason to believe that evaluations were necessary or if the Parents made a request for an evaluation.[6] The latter did not happen. There is no evidence that the District should have proposed an evaluation between January 2016 and the end of the 3rd grade school year. This is not to say that the entirety of 3rd grade was smooth sailing. The Student certainly exhibited behaviors consistent with the Student's ADHD diagnosis. The teachers and Parents were in frequent communication about those behaviors. Education, of course, is much more than academics. If the Student's behaviors warranted an evaluation – regardless of academic progress – the District was obligated to offer one. In this case, the record supports a finding that the Student was amenable to redirection (a basic, good teaching strategy), was able to complete work with that redirection, and benefited from the small group instruction that the District provided. Although there is some evidence that the Student experienced school-related anxiety, there is an equal amount of evidence that the Student thrived socially in school. None of the Student's behaviors warranted disciplinary action. The District did not error by failing to offer additional evaluations in 3rd grade.

**Provision of FAPE - The 2016-17 School Year (4th Grade)**

The District provided a FAPE to the Student during the 2016-17 school year (4th grade).

The Student's IEP for 4th grade was drafted at the end of 3rd grade. As discussed above, the Student made meaningful progress in 3rd grade. It was appropriate, therefore, for the District to draft and propose an IEP designed to keep the momentum going. This is what the District did in the 2016 IEP. That said, there is a serious mistake in the 2016 IEP. The 2016 IEP was intended to be delivered during the very end of the 2015-16 school year (3rd grade) and nearly all of the 2016-17 school year (4th grade). Also, at the time that the 2016 IEP was written, the Student had mastered the writing goal. Despite both of these factors, the writing goal did not change. As such, for 4th grade, the District proposed that the Student continue working on a 3rd grade level goal that was mastered during 3rd grade.

The District could have drafted an IEP to continue the 3rd grade goal for the remainder of 3rd grade, and then start a 4th grade goal in 4th grade. The District did not do this. Instead, the 4th grade special education teacher continued the goal but at a 4th grade level with the Parents' knowledge and consent – but without changing the IEP. The District could have proposed a revision to the IEP, even without a meeting, but did not do so. As a result, the Student's IEP contained an outdated goal for nearly the entirety of 4th grade.

---

[6] When parents request an IDEA evaluation, LEAs must either grant the request or initiate a due process hearing.

I find that the error in the 2016 IEP constitutes a procedural violation, not a substantive violation. The 2016 IEP should have been revised to reflect what the teacher and Parents agreed to do. However, the Parents were informed about changed in practice if not on paper, and consented to that change. More importantly, the goal in practice was appropriate for the Student. The Student had difficulty writing five-paragraph assignments, and so it was proper for the District to target that difficulty through the provision of small group instruction in the Language Arts pull-out.

Regarding academics, the situation in 4th grade was no different than the year prior. The Student advanced through an unmodified, regular education curriculum with nothing more than the accommodations provided through the IEP and good teaching practices. Again, actual progress is not evidence that the 2016 IEP was or was not substantively appropriate when it was offered. Rather, actual progress is evidence of whether the District was obligated to reevaluate the Student or propose changes to the IEP. In this case, when it comes to the Student's academic progress, there is no evidence that the District was obligated to do either.

The situation in 4th grade was somewhat different in terms of the Student's behavior. There is stronger evidence that the Student experienced anxiety in school in 4th grade. Again that evidence is primarily in the form of testimony from both the Parents and teachers. There is also evidence that the Parents and teachers were in frequent communication about the Student's behaviors. All of those behaviors, however, were consistent with ADHD. None rose to a level that warranted discipline, but some negative peer interactions were starting.

Despite the foregoing, there is no dispute that the Student expressed suicidal thoughts to the Parents in November 2016. The District hypotheses that the Student's anxiety is linked to medication changes. There is evidence to support the District's position. However, the underlying cause of the Student's anxiety and expression of suicidal thoughts, in the context of this case, is not relevant. The District had no reason to believe that additional evaluations were necessary before November 2016, and so what matters are the District's actions and inactions once the District became aware of the Student's expression of suicidal thoughts.

The District became aware of the situation around the time of the mid-year meeting in 4th grade. At that time, the Student's team considered a neuropsychological evaluation, an OT evaluation, and placement in a social skills group. The District informally offered all of these. The Parents declined the offers, preferring to obtain a neuropsychological evaluation independently. The Parents had already reached out to the private psychologist, and were intent to pursue that path. In sum, the Parents alerted the District to a serious problem, the District then convened the IEP team and offered an evaluation, and the Parents declined. All of this is consistent with IDEA mandates.

Unfortunately, none of the paperwork generated with these events is consistent with IDEA mandates. If the District believed that a neuropsychological evaluation or OT

evaluation were warranted, the District should have proposed those through a written PTE. As discoed above, the District's belief that an evaluation is needed triggers its obligation to offer one. It does not matter if that belief was formed through brainstorming with the Parents, or if the District knew the Parents would reject the offer. The District failed in this regard.

As with the deficiencies in the 2016 IEP, I find that the District's failure to formally propose evaluations following the 4th grade mid-year meeting constitutes a procedural violation, not a substantive violation of the IDEA. The District's inactions cannot be separated from the overall context in which they (did not) occur. There was no ambiguity about what evaluations the District was proposing in fact, even if not on paper. Similarly, there was no ambiguity that the Parents rejected that offer and were pursuing their own evaluation. The District's failure to document the unambiguous offer and rejection using specific, IDEA-compliant forms has no bearing on the Student's substantive right to FAPE in this case.[7]

After the mid-year meeting, the Student's situation in school remained unchanged. The Student continued to progress through an un-modified 4th grade regular education curriculum. The Student was able to make this progress with what boils down to pull-out small group instruction in Language Arts, extra time to complete assignments, and good teaching practices. Neither the Student's anxiety nor ADHD-related behaviors impeded the Student's academic progress. The negative peer interactions were minimal and did not require significant intervention. There were no disciplinary issues.

The Student was proficient in 4th grade academic skills by the end of 4th grade and made meaningful progress towards the writing goal. As compared to 3rd grade, by the end of 4th grade, the Student's social and work skills development had also improved. The Student's promotion to 5th grade was legitimate.

**Tuition Reimbursement**

The Parents are not owed tuition reimbursement.

The first part of a tuition reimbursement analysis is to assess the appropriateness of the programming that the Parents rejected. In this case, the Parents rejected the Revised 2017 IEP (P-13). I find that the Revised 2017 IEP was reasonably calculated at the time it was offered to provide a FAPE to the Student.

As discussed above, the Student received a FAPE under the 2016 IEP during the 2016-17 school year (4th grade). At a basic level, it was appropriate for the District to propose an IEP designed to continue the Student's progress. The Revised 2017 IEP

---

[7] Readers are cautioned that this determination is highly case and fact specific. A procedural violation of the IDEA can quickly become substantive under different facts. Nothing herein is an invitation for LEAs to keep sloppy paperwork or otherwise deviate from the IDEA's procedural obligations.

does exactly that. The Student was improving, but still needed assistance in writing five-paragraph assignments. It was appropriate, therefore, for the District to continue that progress by targeting that skill in a small group with a special education teacher. Otherwise, the Revised 2017 IEP continues the services that enabled the Student to pass the 4th grade curriculum into 5th grade.

The Parents' primary challenge to the Revised 2017 IEP flows from the private neuropsychological report. As noted above, I give that report very little weight. However, even if I will to give extreme weight to the report, the outcome would be the same. The District had no obligation to adopt the report in its entirety or offer an IEP incorporating all of the reports recommendations. Rather, the District had an obligation to consider the report as part of the IEP development process. The District did that. It reviewed the report between offering the 2017 IEP and the Revised 2017 IEP, and saw that the report provided very little in the way of new information. Even so, the District also made changes to the Revised 2017 IEP by incorporating some of the reports' recommendations. Specifically, the report called for direct instruction of executive functioning skills. The District offered to provide that as an SDI in the Revised 2017 IEP. Again, the services and supports in place for the Student enabled the Student to progress through the regular education curriculum without modifications in all domains except for writing. The services and supports in place also enabled the Student to make meaningful progress in writing. Even after considering the neuropsychological report, it was appropriate for the District to offer an IEP designed to continue the Student's progress.

The Revised 2017 IEP was appropriate and, therefore, the Parents have not satisfied their burden in regard to the first prong of the *Burlington-Carter* test. Consequently, the Parents are not entitled to tuition reimbursement.

An order consistent with the foregoing follows.

### ORDER

Now, November 16, 2018, it is hereby **ORDERED** as follows:

1. The District provided the Student a FAPE from January 2, 2016 through the start of the 2016-17 school year.

2. The Parents are not entitled to tuition reimbursement.

It is FURTHER ORDERED that any claim not specifically addressed in this order is DENIED and DISMISSED.

/s/ Brian Jason Ford
HEARING OFFICER