**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ZACHARY J., through his parents,** | : | **Civil Action** |
| **JONATHAN and JENNIFER J.,** | : | |
| | : | **No. 19-0652** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **COLONIAL SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant.** | : | **Hon. John Milton Younge** |

**DEFENDANT, COLONIAL SCHOOL DISTRICT'S COMBINED BRIEF
IN OPPPOSITION AND IN SUPPORT OF CROSS-MOTION FOR
<u>JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

Plaintiffs offer an imprecise sort of "do over" against the hearing officer's decision. They challenge his factual finding and application of those facts to law very broadly. But his reasoning is well-stated. Suffice to say, the animating point was Z.J. progressing grade-to-grade while participating in the regular education setting and within the general curriculum. That remains fundamentally unchallenged; Plaintiffs point instead to other factors, largely emanating from their incredible expert. These things have no bearing on Z.J.'s progress grade-to-grade in regular education, unless one accepts the argument that more stuff is better. But that would be contrary to law.

## I.   STANDARD OF REVIEW.

An IDEA appeal is subject to "modified *de novo*" review. *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3rd Cir. 2003). The

district court "may reach an independent decision, except that it must accord the decision of the [hearing officer] 'due weight' in its consideration." *Carlisle Area Sch. Dist. v. Scott P.,* 62 F.3d 520, 524 (3rd Cir. 1995), *cert. denied*, 517 U.S. 1135 (1996).   "Due weight" means "[f]actual findings from the administrative proceedings are to be considered *prima facie* correct." *S.H*., 336 F.3d at 270.  If the court departs from the administrative findings, it must detail why. *Id*.; *Scott P.,* 62 F.3d at 527.

The burden of proof is on the party bringing the administrative complaint, here the Plaintiffs, a burden that continues on appeal. *Schaffer v. Weast*, 546 U.S. 49 (2005); *L.E. v. Ramsey Bd. of Educ*., 435 F.3d 384 (3rd Cir. 2006).

## II.   ARGUMENT.

### A.   Ruling and application about the limitations period is correct.

The IDEA has a two year time limitation.  20 U.S.C. § 1415(f)(3)(C) ("shall request an impartial due process hearing within 2 years").  *See also* 20 U.S.C. § 1415(b)(6)(B) ("sets forth an alleged violation that occurred not more than 2 years before").  It operates as a discovery rule, *G.L. v. Ligonier Valley Sch. Dist. Auth*., 802 F.3d 601, 625 (3d Cir. 2015), but within "the structure and text of the statute,"

*Disabled in Action of Penn. v. Southeast Penn. Transp. Auth.*, 539 F.3d 199, 209

(3d Cir. 2008) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)).[1]

Colonial School District had the burden to establish that the limitations

period applies. *Van Buskirk v. Carey Canadian Mines, Ltd*., 760 F.2d 481, 487 (3d

Cir. 1985). It did so by showing procedural compliance with the Act and that it

provided Prior Written Notice ("PWN") of its actions.[2] The burden then shifted to

Plaintiffs to establish either that a statutory exception applied (not raised below,

*see* Plaintiffs' Mot. for Judg. Ex. A., H.O. Dec. ECF 16-1 at 7 of 9)[3] or that the

discovery rule runs to their benefit. *Debiec v. Cabot Corp*., 352 F.3d 117, 129 (3d

Cir. 2003) (discussing Pennsylvania case law); *Van Buskirk*, 760 F.2d at 487

(same). *See also G.L.*, 802 F.3d at 626. Plaintiffs had the burden "to establish that

---

[1]     The IDEA is Spending Clause legislation. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006). Any conditions must be set out "unambiguously," *id.* at 296, and interpreted cautiously, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

[2]     Parents also received the notice of procedural safeguards, Admin. Rec. N.T. at 49:18-2 and Admin. Rec. S-11 at 2 of 16; Admin. Rec. N.T. at 50:19-22 and Admin. Rec. S-14 at 2 of 18; Admin. Rec. N.T. at 51:21-24 and Admin. Rec. S-18 at 2 of 19; Admin. Rec. N.T. at 61:12-14 and Admin. Rec. S-31 at 2 of 21; Admin. Rec. 63:22-24 and Admin. Rec. S-37 at 2 of 23, which the IDEA requires a public school to give to parents letting them know they can sue the school district if they believe the educational program is not right, *see* 20 U.S.C. § 1415(a) and (d).

[3]     Parents' misrepresentation argument, a statutory exception, 20 U.S.C. § 1415(f)(3)(D)(i), is waived, *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist*., 904 F.3d 248, 256 (3d Cir. 2018). In any event, what is no more than a suggestion of differing views, *see e.g.*, Plaintiffs' Brief ECF 16 at 12 of 39 (noting difference in report cards and certain assessment results), is not a misrepresentation or misleading. *D.K. v. Abington Sch. Dist*., 696 F.3d 233, 246 (3d Cir. 2012).

the discovery rule should apply to [their] particular case." *Van Buskirk*, 760 F.2d at 487. *See also MRL Dev. I, LLC v. Whitecap Inv. Corp*., Civ. A. 2013-48, 2014 WL 6461583, *14 (D.V.I. Nov. 18, 2014), *aff'd on other grounds*, 823 F.3d 195 (3d Cir. 2016). Plaintiffs' contrary argument is incorrect.

Plaintiffs cite Federal Rule of Civil Procedure 8. But that Rule states only that in a proceeding run by those rules, a party answering a claim must "affirmatively state" a statute of limitations defense.[4] The Rule doesn't apply. *But see* Admin. Rec. S-2 at 2 of 4 (stating "affirmative defenses").

Plaintiffs cite *Moore v. Kulicke & Soffa Indus., Inc*., 318 F.3d 561 (3d Cir. 2003). Per that case, sometimes the claimant bears the burden, and sometimes the anti-claimant bears the burden. The case analyzed when a defense is affirmative and when it is really an element. It notes factors, such as access to information and proving a negative, that drive the burden allocation. In our case, not only is timeliness a statutory element, but proof about parents' state of mind best rests with them.

Ultimately, deciding the issue is unnecessary. The hearing officer's decision did not rest on an evidentiary knife-edge. Throughout his analysis he finds parents

---

[4] The IDEA sets out its own procedural rules, specifying what must be stated in an administrative complaint notice, 20 U.S.C. § 1415(c)(2)(A), and what must be stated in a public school's administrative response, 20 U.S.C. § 1415(c)(2)(B). Nothing in the IDEA says the "timeline for requesting a hearing," 20 U.S.C. § 1415(f)(3)(C), is an "affirmative defense" *ala'* Rule 8. Rather, "the structure and text" makes clear that timeliness is an element of the claim.

were actively engaged in discussing their concerns and knew of the School District's responses.  Colonial School District proved parents knew.

Plaintiffs' current argument, that only actual knowledge triggers discovery, is wrong.  Plaintiffs' Brief ECF 16 at 9 of 39 (asserting discovery after receiving private psychological report).  Parents do not need to know the exact cause of their injury or that they even have a cause of action.  *Bohus v. Beloff*, 950 F.2d 919, 924–25 (3d Cir. 1991) (citing Pennsylvania cases).  They need to be aware of the alleged injury only, not "that this injury constitutes a legal wrong." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994) (applying federal law).  The hearing officer correctly determined that the trigger is "when reasonable parents are able to conclude that their child's needs are unmet." Plaintiffs' Mot. for Judg. Ex. A, H.O. Dec. ECF 16-1 at 2 of 9.  They don't need to know "that [a] FAPE was, in fact, being denied," Plaintiffs' Brief ECF 16 at 10 of 39, or know "of the **actual** denial of [a] FAPE," Plaintiffs' Brief ECF 16 at 13 of 39 (emphasis in original), just that they believe it is possibly being denied.

"The 'polestar' of the discovery rule is not the plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff." *Debiec*, 352 F.3d at 129.  *See also Vitalo v. Cabot Corp.*, 399 F.3d 536, 538–39 (3d Cir. 2005) ("the touchstone"); *Oshiver*, 38 F.3d at 1386 ("the polestar").  "Reasonable diligence is an objective, rather than a

subjective standard. Under this standard, the plaintiff's actions must be evaluated to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Cochran v. GAF Corp*., 542 Pa. 210, 666 A.2d 245, 249 (1995), as quoted in *Debiec*, 352 F.3d at 129. *See also Vitalo*, 399 F.3d at 543. "A different rule, we have noted, would require an insufficient degree of diligence on the part of the potential claimant." *Oshiver*, 38 F.3d at 1386. The IDEA is no exception. *G.L.*, 802 F.3d at 625.

The hearing officer properly scrutinized parents' administrative complaint notice, Admin. Rec. S-1, to identify just what violations they alleged, Plaintiffs' Mot. for Judg. Ex. A, H.O. Dec. ECF 16-1 at 3 of 9, followed by rather detailed factual findings, *id* at 4-6 of 9. The factual findings readily support the conclusion that parents knew or should have known of the alleged violations. Parents' own administrative complaint notice goes on likewise: parents knew about Student's ADHD, etc., before the Reevaluation Report, which, they claim, didn't sufficiently assess needs related to ADHD, etc., Admin. Rec. S-1 at 4 of 9; parents knew that IEPs, allegedly, failed to address all of his needs, such as his "obvious executive functioning deficits," Admin. Rec. S-1 at 5 of 9. That the IEPs did not, allegedly, include a Positive Behavior Support Plan or provide Extended School Year, Admin. Rec. S-1 at 5 of 9, is facially obvious. Following *E.G. v. Great Valley*

*School District*, Civ. A. 16-5456, 2017 WL 2260707 (E.D. Pa. May 23, 2017), the hearing officer reasoned the discovery date for each alleged violation and so carried out the "fine-grained analysis" for each one.

### B.   Colonial School District provided a FAPE.

The IDEA "open[ed] the door of public education to [disabled] children on appropriate terms" but did not "guarantee any particular level of education once inside." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982).  *See also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, --- U.S. --- , --- ,137 S. Ct. 988, 998, 197 L. Ed. 2d 335, ----  (2017) ("No law could do that—for any child.").  The law requires a public school to "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F*., 137 S.Ct. at 999.  *See also K.D. ex rel. Dunn v. Downingtown Area Sch. Dist*., 904 F.3d 248, 254 (3d Cir. 2018).

"IEPs must be reasonable, not ideal."  *K.D.*, 904 F.3d at 255.  *See also D.B. ex re. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1ˢᵗ Cir. 2012) ("The IDEA's requirements regarding a FAPE are 'modest'."); *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 325 (4ᵗʰ Cir. 2004) (same).  An IEP is the "floor of opportunity;" a public school is not required to maximize a student's potential, "provide the optimal level of services, or even a level that would confer additional benefits . . . ." *Scott P.*, 62 F.3d at 533-34.   Ultimately, "personalized instruction  .  .  .  with  sufficient

supportive services to permit the child to benefit from the instruction," together with "the other items on the definitional checklist [20 U.S.C. § 1402(8)]" is a FAPE. *Rowley*, 458 U.S. at 189, 206-07.

Whether an IEP is appropriate is a question of fact. *K.D.*, 904 F.3d at 254. "Courts are not to substitute their own notions of sound educational policy for those of school authorities . . . ," *Rowley*, 458 U.S. at 206, but "must accord significant deference to the choices made by school officials as to what constitutes an appropriate program for each student," *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 277 (3rd Cir. 2012). "When schools use their expertise to address each child's distinct educational needs, we must give their judgments appropriate deference. . . . [W]e may not substitute [our] own notions of sound educational policy for those of the school authorities which [we] review." *K.D.*, 904 F.3d at 250–51 (cites and quotes omitted; brackets in original). Fact-finders "may not rely on hindsight to second-guess an educational program that was reasonable at the time." *Id*. at 255. *See also D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564-65 (3rd Cir. 2010).

Important to this case, evidence of grade-to-grade progression, especially for fully integrated students, is compelling proof of a FAPE. "As *Endrew F.* explained, 'for a child fully integrated in the regular classroom, an IEP typically should . . . be reasonably calculated to enable the child to achieve passing marks

and advance from grade to grade.' "  *K.D.*, 904 F.3d at 255  (quoting *Endrew F.*, 137 S. Ct. at 999, in turn quoting *Rowley*, 458 U.S. at 203-04).

Attempting to counter this critical fact, Plaintiffs look back in hindsight. *See, inter alia.*, Plaintiffs' Brief ECF 16 at 14 of 39.  The degree of progress – the outcome – is not the measure.  *Endrew F.*, 137 S. Ct. at 998.  Rather,

> The IDEA contemplates educational programs tailored to "how the child's disability affects the child's involvement and progress in the general education curriculum."  20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa). Rather than presuming grade-level advancement, the Act requires revisions to education programs "*as appropriate* to address any lack of expected progress toward the annual goals and in the general education curriculum, *where appropriate*."  *Id*. § 1414(d)(4)(A)(ii), (ii)(I) (emphases added).

*K.D.*, 904 F.3d at 255.  The IEP Team considered Z.J.'s "unique circumstances" and his progress in the general curriculum, and decided upon program revisions, as appropriate, largely based on parental concerns but without impacting positive progress in the general curriculum.

Here, there was no part of Z.J.'s program that needed revising to address a "lack of expected progress."  Z.J. was in the regular education classroom for everything except small group writing in Third Grade and small group LA in Fourth Grade, and he participated entirely in the general curriculum (even when in

the small group instruction) for everything, except Speech.[5]   The hearing officer found Z.J. progressed grade-to-grade; that he spent most of his school day in the regular education instructional setting; and that he progressed through the general curriculum, which was not modified or "watered-down" in any respect.   Plaintiffs' Mot. for Judg. Ex. B, H.O. Dec. ECF 16-2 at 11 and 13 of 15, among others.   His findings are well supported in the record.[6]

The following factual deep-dive shows that Z.J. progressed grade-to-grade in the general curriculum, that the curriculum was not "watered-down" for him, and that his performance was judged by the same quality standards applied to non-disabled peers.   He didn't need changes to instruction, he didn't need special instruction, he just needed some accommodations, *e.g.*, prompting and one-on-one attention.   The record facts show how the hearing officer did not err.

---

[5]   "Regular education" refers to the setting, *i.e.*, the typical classroom. "General curriculum" refers to instructional content, *i.e.*, the content and methods of instruction received by non-disabled students.   The two are distinct but unfortunately often interchanged.

[6]   Plaintiffs make a reference, with footnote, to "Direct Instruction."   Plaintiffs' Brief ECF 16 at 14 of 39 n. 3.   So-called "capital D, capital I," Direct Instruction, is a proprietary intervention, not the common, non-proprietary, specially designed instructional technique.   Most persons can learn intuitively, having an innate ability to connect-the-dots through reasoning and experience to draw a conclusion.   But some have difficulty with intuitive learning.   Such persons often require direct and explicit instruction, going over each dot and being lead to the next dot to make connections.   This small d, small i, direct instruction, requires no purchase, no license.   There is no evidence, and Plaintiffs cite to none, that Z.J. can learn only by using the propriety program.   Indeed, progressing grade-to-grade in a general curriculum shows otherwise.

### 1.    Z.J.'s Third Grade year.

During the Third Grade year, Thomas Kane was Z.J.'s regular education teacher and Priscilla Holleran was Z.J.'s learning support teacher.  Ms. Holleran has a degree in psychological services, further education and certification in special education, lengthy special education teaching experience, and even Wilson Reading certification.  Admin. Rec. N.T. at 179:25 – 181:3 (Holleran).

Z.J.'s needs did not change.   Admin. Rec. N.T. at 189:9-20, 190:5-13 (Holleran).   He struggled at times with attention and focus and he needed prompting and redirection.  Admin. Rec. N.T. at 446:5-20 (Kane).  Support with attention and focus was Z.J.'s need in reading.   Admin. Rec. N.T. at 447:12-14 (Kane).  The IEP's specially designed instruction ("SDI")[7] addressed attention and focus.  Admin. Rec. N.T. at 197:11-16 (Holleran).

Z.J. received pull-out instruction for written expression with Ms. Holleran for about 30 minutes most days.   Admin. Rec. N.T. at 182:3-8, 185:7-13 (Holleran); Admin. Rec. N.T. at 452:10-12 (Kane).  This instruction occurred at the same time as Mr. Kane instructed writing in the regular education classroom. Admin. Rec. N.T. at 185:2-5 (Holleran).  Z.J. "didn't write a lot," but "what he did he did fine. . . ."  Admin. Rec. N.T. at 219:20-22 (Holleran).  *See also* Admin. Rec. N.T. at 221:5-6 (Holleran).  Z.J.'s impediment to writing was "attention and

---

[7]    *See* 34 C.F.R. § 300.39(b)(3) (defining specially designed instruction).

wanting to get down to it.  It was hard for him to sit down.  He could talk it through with you, he could write it out on the paper, but just getting it out and writing it."  Admin. Rec. N.T. at 220:6-8 (Holleran).  He was able to get it out with close attention, one-on-one assistance, encouragement, and praise.  Admin. Rec. N.T. at 220:12-25 (Holleran).   Z.J.'s writing instruction followed the general education curriculum.  Admin. Rec. N.T. at 195:18-21 (Holleran).

All other instruction, including reading, was with Mr. Kane in regular education.  Admin. Rec. N.T. at 182:14-17 (Holleran).  *See also* Admin. Rec. N.T. at 212:11 – 213:10 (Holleran, describing shared reading and guided reading).  Z.J. "came into third grade proficient in reading."   Admin. Rec. N.T. at 213:13 (Holleran).  Benchmark testing did not show any particular needs except "a little bit of the reading comprehension, but only because he couldn't hold the question in his head long enough to then answer it appropriately.  But with scaffolding and all kinds of extra help, he would then be able to answer the questions correctly."  Admin. Rec. N.T. at 214:8-13 (Holleran).  *See also* Admin. Rec. N.T. at 215:9 – 216:25 (Holleran, describing scaffolding).  Z.J.'s reading and math were at grade level.  Admin. Rec. N.T. at 452:24 – 453:1 (Kane).  In core content, *see* 34 C.F.R. § 300.10, Z.J. was assessed through, and progressing in, the general curriculum.  Admin. Rec. N.T. at 453:14 – 454:6 (Kane).

Z.J. received support to attention.  He could move around and stretch, stand at his desk, even lie on his stomach, and had nonverbal signals from teacher that he understood and were worked-out with him in private, all to redirect him.  Admin. Rec. N.T. at 223:10 – 224:12, 229:12-17 (Holleran).  *See also* Admin. Rec. N.T. at 237:20-21 (Holleran, working out visual reminder with Z.J.).  He needed movement to be less "anxious."  Admin. Rec. N.T. at 224:19-20 (Holleran).  *See also* Admin. Rec. N.T. at 455:19 -456:4, 457:9-17 (Kane, discussing movement). Z.J.'s inattention likely lead to what staff described as his misperception of events that might then spill into "anxiety" and occasional peer issues.  Admin. Rec. S-45 at 1; Admin. Rec. N.T. at 239:8 – 241:2 (Holleran).  "Anxiety" manifested in the sense that Z.J. did not want to be embarrassed.  Admin. Rec. N.T. at 190:14 – 191:5 (Holleran).  *See also* Admin. Rec. N.T. at 222:2-17 (Holleran, explaining context); Admin. Rec. N.T. at 303:15 – 304:20 (Watson[8], explaining Fourth Grade).  Z.J. also did not like being pulled out of class.  Admin. Rec. N.T. at 111:16 (father).  *See also* Admin. Rec. N.T. 302:5-15 (Watson).  He did not like to look different, which was always part of the discussion with parents about possible interventions and supports in school.  Admin. Rec. N.T. at 209:23 – 210:4 (Holleran).

---

[8]     Caitlyn Watson, Z.J.'s Fourth Grade special education teacher.

Z.J. experienced many medication changes.[9]  Staff and parents considered a behavior system for him during Third Grade, but decided that wouldn't help until his medications were stabilized.  Admin. Rec. N.T. at 231:15 – 232:11 (Holleran). Ms. Holleran believed Z.J. would not find success in a rewards system for behavior he couldn't control.  Admin. Rec. N.T. at 232:1-11 (Holleran).  *See also* Admin. Rec. N.T. at 293:13 – 294:10 (Watson, noting Fourth Grade behavior chart was a "stressor" for Z.J.).  In any event, with the IEP's SDI, Z.J. was doing better by mid-year.  Admin. Rec. S-47; Admin. Rec. N.T. at 235:1-6 (Holleran).

Ms. Holleran prepared for the May 2016 IEP Team meeting.  Admin. Rec. N.T. at 241:20 – 242:20 (Holleran, describing preparatory activities).  The IEP going into Fourth Grade (Admin. Rec. P-9) changed / added to SDI a little bit. Admin. Rec. N.T. at 206:7 – 207:4 (Holleran).  Z.J. was promoted to the Fourth grade.

---

[9]     Plaintiffs complain there is no medical testimony.  Plaintiffs' Brief ECF 16 at 18 of 39.  That's like saying one needs medical evidence to conclude alcohol consumption or recreational drug use might affect a person's behavior.  If the "medication changes were made to *reduce* behaviors," Plaintiffs' Brief ECF 16 at 18 of 39, it's no abuse to conclude medication changes might, and did, affect behavior.  Plaintiffs note testimony from their private evaluator that, based on her review of unspecified documents, she did not see "dramatic changes" in Z.J.'s behavior related to medication changes.  Plaintiffs' Brief ECF 16 at 18 of 39.  But we know this expert never spoke to teachers and was not privy to the many emails between school staff and parents about medication changes and behavior.  *See, inter alia*., Admin. Rec. S-43-45, 47, 50, 52-54, 57, 61.  "Blame the medication," Plaintiffs' Brief ECF 16 at 18 of 39, is not the issue; rather, stability of presentation as impacting instruction is.

## 2.    Z.J.'s Fourth Grade year.

Patrice Bobyock was Z.J.'s regular education teacher and Caitlyn Watson was Z.J.'s special education teacher during his Fourth Grade year.  Ms. Watson also has reading specialist certification.  Admin. Rec. N.T. at 261:9-13 (Watson). Prior to receiving Z.J., she reviewed various records.  Admin. Rec. N.T. at 267:12-19 (Watson).  Z.J. was on grade level for reading.  Admin. Rec. N.T. at 269:2-3, 313:12-13 (Watson).  *See also* Admin. Rec. N.T. at 339:13-14 (Watson, "[Z.J.] was showing that he was reading on grade level.").  He needed accommodations for attention and focus, but the curriculum was not modified.  Admin. Rec. N.T. at 313:14 – 314:7 (Watson).

Z.J. received large group Language Arts instruction in the regular education classroom.  Admin. Rec. N.T. at 265:5-8 (Watson).  When the regular education class broke into small groups for Language Art instruction, Ms. Watson taught Z.J. in small group for Language Arts, about 60 minutes each day.  Admin. Rec. N.T. at 263:13-16, 264:10-18, 265:9-12, 346:9-18 (Watson).    Teachers deliberately planned this timing so Z.J. would not miss any new instruction.  Admin. Rec. N.T. at 302:5-19 (Watson).    Missing instruction was a stressor for Z.J.  Admin. Rec. N.T. at 370:9-10 (mother).  *See also* N.T. at 370:17 (mother, missing instruction makes Z.J. "stressed").  The time with Ms. Watson was supplemental, Admin. Rec. N.T. at 347:21-24 (Watson), with either direct instruction or independent work,

Admin. Rec. N.T. at 348:1-2 (Watson). Z.J. struggled with longer reading assessments, "but that seemed to be due to his attention and his focus due to it being a longer assignment, even though it was broken down and chunked out over several days." Admin. Rec. N.T. at 339:20-23 (Watson).

Although Ms. Watson did not revise the IEP's writing goal, she was monitoring it on Fourth Grade, grade-level, expectations based on a five-paragraph writing piece, which she communicated to parents. Admin. Rec. N.T. at 271:5-15 (Watson). Like Ms. Holleran, she instructed Z.J. through the general education curriculum and supplemented it with "strategies and differentiation." Admin. Rec. N.T. at 277:20-23 (Watson). *See also* Admin. Rec. N.T. at 314:1 – 317:13 (Watson, describing writing instruction). But even in regular education, all students used graphic organizers, planning techniques, idea generation. Admin. Rec. N.T. at 278:3-10 (Watson). The SDI for Z.J. was, really, small group instruction tied to his need for focus and attention. Ms. Watson monitored Z.J.'s writing three times per trimester. Admin. Rec. N.T. at 278:17-22 (Watson).

Z.J. continued with medication changes, the effects of which resulted in a mid-year meeting with parents. Admin. Rec. N.T. at 281:6-14 (Watson). *See also* Admin. Rec. N.T. at 307:14-19 (Watson, describing medication changes, behaviors, and assessment); Admin. Rec. N.T. at 309:5-14 (Watson, referring to January or February meeting with parents). Staff suggested various supports to

help Z.J. socially and emotionally, but parents declined.   Admin. Rec. N.T. at

282:13-17 (Watson).   The participants discussed an occupational therapy ("OT")

evaluation and a social skills / school preparedness group, but parents didn't want

to pursue either.   Admin. Rec. N.T. at 309:23 – 310:17, 339:1-6 (Watson).   *See*

*also* Admin. Rec. N.T. at 370:2-10 (mother, social skills), Admin. Rec. N.T. at

371:2-12 (mother, OT).   Parents did not want Z.J. to leave academic instruction in

order to engage in a social skills group.   Admin. Rec. N.T. at 370:2-10 (mother).

Ms. Watson described Z.J.'s favorable response to various intervention trials

during small group, which were not then transferred to the regular setting "because

he didn't want to be perceived as different."   Admin. Rec. N.T. at 305:7-11

(Watson).   *See also* Admin. Rec. N.T. at 334:21-22 (Watson, "It seemed that the

Parents did not want him to do them in the regular education setting.").

Parents understate the amount of known medication changes.   *See* Admin.

Rec. N.T. at 374:3 – 376:22 (mother).[10]  Compare that with the facts: Admin. Rec.

N.T. at 377:18 – 380:8 (mother); Admin. Rec. S-43, 4, 45, 47, 50, 51, 52, 53, 54,

55, 57, 61 (all directly addressing medications, dosages, appointments, and dosage

schedules).   Parents acknowledge that at least one medication caused anxiety.

Admin. Rec. N.T. at 375:22-24 (mother).   *See also* Admin. Rec. N.T. at 583:9-12

(Schmidt, discussing struggles with side-effects).   Parents even shared staffs'

---

[10]     Apparently Z.J.'s medication regime has been stable the entire time he
attended the private school.  Admin. Rec. N.T. at 144:6-14 (father).

concern that a behavior plan should not be developed while Z.J.'s medication regime was not stabilized.  Admin. Rec. N.T. at 388:3-8 (mother).

Z.J.'s instructional need was attention and focus.   Admin. Rec. N.T. at 318:2-10 (Watson).  *See also* Admin. Rec. N.T. at 396:24 – 397:6 (Bobyock, discussing needs).  "Sometimes" Z.J. was "unfocused, unable to maintain his attention.  Other times, he was very engaged. . . ."  Admin. Rec. N.T. at 349:9-14 (Watson).  There were ups-and-downs over the year, but as discussed at the May 2017 IEP Team meeting, Z.J. was more behaviorally consistent and calmer, "[a]nd that was after the different medication changes throughout the middle course of the year."  Admin. Rec. N.T. at 350:12-22 (Watson).

Z.J. did not need changes or adaptations to the content of the general curriculum.  Admin. Rec. N.T. at 398:5-9 (Bobyock).  He needed some changes to delivery of instruction, such as extra time and attention, and quality teachers, such as Ms. Bobyock, who would "have an additional lesson at hand at the ready, for other students, to provide . . . extra time [to Z.J.]."  Admin. Rec. N.T. at 398:8-12 (Bobyock).  *See also* Admin. Rec. N.T. at 398:14-17, 399:5-12, 400:2-6, 402:5-10, 407:5 – 408:6 (Bobyock, offering examples of Z.J.-specific instructional activities); Admin. Rec. N.T. at 403:9-20 (Bobyock, discussing instructional coordination).  *See also and compare, e.g.*, Admin. Rec. N.T. at 547:18 – 548:3, 550:7-19 (Schmidt, discussing same/similar strategies); Admin. Rec. N.T. at

551:16-17 (Schmidt, discussing "repeated readings")[11]; Admin. Rec. N.T. at 564:1-3 (Schmidt, discussing subgroups and read a-louds); Admin. Rec. N.T. at 565:16 (Schmidt, discussing scaffolding, cueing, and modeling); Admin. Rec. N.T. at 565:21-22 (Schmidt, discussing visual/tangible models).   For example, Z.J. was placed with Ms. Watson for small group reading, not because of any skill deficit but for greater attention and focus.   Admin. Rec. N.T. at 440:4-16 (Bobyock).   Surely not coincidently, Schmidt used the same strategies in order to break up her own two, 3-hour test sessions.   Admin. Rec. N.T. at 585:18 – 586:4 (Schmidt).

Teachers held Z.J. to the same quality expectations as other students in the regular education classroom.   Admin. Rec. N.T. at 405:25 – 406:5 (Bobyock).   *See also* Admin. Rec. N.T. at 413:3-9 (Bobyock, discussing extra time and quality commensurate with peers).   Z.J. earned promotion to the Fifth grade.   Admin. Rec. N.T. at 416:17-21 (Bobyock).[12]

### 3.   The 2017 IEPs.

Parents never told school staff of their supposed concerns regarding a functional behavioral assessment ("FBA"), or an assistive technology assessment, or an Anxiety assessment, or a re-evaluation generally during Third and Fourth

---

[11]   Repeated Readings are not SDI but are part of the regular curriculum. Admin. Rec. N.T. at 642:2-6 (McNamara).

[12]   AIM Academy is not providing Z.J. with a specialized reading curriculum. Admin. Rec. N.T. at 145:4-9 (father).   Reading comprehension instruction teaches strategies, like scaffolding.   Admin. Rec. N.T. at 145:14-25 (father).

Grades.[13]    Instead, and on the asserted basis of "relying on Teachers' recommendations," Admin. Rec. N.T. at 369:17 (mother), parents took their concerns to a private evaluator.  Admin. Rec. N.T. at 382:9-23 (mother).  Those concerns were said to be about "struggles with attention, his impulsivity in calling out, comprehension, executive function."  Admin. Rec. N.T. at 383:16-17 (mother).  Staff saw these things in school but did not believe it rose to the need for an evaluation or that those actions interfered much with schooling.  *See* Admin. Rec. N.T. at 414:14 – 415:1 (Bobyock).

Ultimately, parents concede that it was not the stated concerns taking them to Schmidt, the private evaluator, in November 2016, Admin. Rec. N.T. at 390:10-14 (mother), but a suicidal threat, Admin. Rec. N.T. at 390:15 – 391:3, 392:15-19 (mother).  Parents never expressed this concern to school staff, either.  Admin. Rec. N.T. at 392:6-12 (mother).  *See also* Admin. Rec. N.T. at 393:8-17 (mother, kept "significant" emails.)

---

[13]    Z.J.'s needs did not require an FBA.  Admin. Rec. N.T. at 641:12 – 642:1 (McNamara).  Staff knew what triggered behavior.  Admin. Rec. N.T. at 318:17-22 (Watson).  Z.J.'s needs did not exceed the capabilities and capacities of his classroom.  Admin. Rec. N.T. at 397:22 – 398:2 (Bobyock).  Socially, Z.J. did not stand out from his peers.  Admin. Rec. N.T. at 296:18-23 (Watson).  He was well liked by peers and any conflicts or issues were those typical of any Fourth Grader.  Admin. Rec. N.T. at 317:17-22 (Watson).  *See also* Admin. Rec. N.T. at 396:13-14 (Bobyock).

Parents provided the Schmidt report, Admin. Rec. S-64, to school staff the day before the May 19, 2017, IEP Team meeting, [14]  Admin. Rec. N.T. at 308:13 (Watson, "I believe it was a day before our meeting.").  *See also* Admin. Rec. N.T. at 120:13-15 (father).  The IEP Team did not have much discussion about the Schmidt report, Admin. Rec. N.T. at 123:10-13 (father), because the school just received it, Admin. Rec. N.T. at 308:21 (Watson).  But the Team went through the report's recommendations.  Admin. Rec. N.T. at 308:21 – 3091 (Watson).  Parents didn't want some of the recommendations in the IEP.  Admin. Rec. N.T. at 308:22 – 309:3 (Watson).  *See also* Admin. Rec. N.T. at 353:11-15 (Watson, referring to February meeting); Admin. Rec. N.T. at 321:21 – 323:6 (Watson); Admin. Rec. S-62 at 29 of 29.  The May 2017 IEP changed the writing goal to reflect five-paragraphs at grade level.  Admin. Rec. P-11 / S-62; Admin. Rec. N.T. at 290:3-6 (Watson).  The IEP added three SDI.  Admin. Rec. P-11 / S-62 at 19 of 29; Admin. Rec. N.T. at 290:7-12 (Watson).

The IEP Team met again in July 2017 to discuss the Schmidt report.  Admin. Rec. N.T. at 123:14-18 (father).  *See also* Admin. Rec. N.T. at 324:14-19, 332:12 –

---

[14]     Plaintiffs imply bad intent to the School District about this date.  Plaintiffs' Brief ECF 16 at 23 of 39 n.6.  Although the IEP Team meeting was initially set for May 11, 2017, and the IEP is dated May 11, 2017, the meeting actually occurred on May 19, 2017.  Parents asked to delay the meeting so they could obtain the Schmidt report first, and staff school agreed so long as they could date the IEP as May 11, 2017, for compliance purposes.  Admin. Rec. N.T. at 283:15-19, 285:5 – 286:11 (Watson).  *See also* Admin. Rec. N.T. at 122:6-10 (father).

333:1 (Watson).  The IEP Team reviewed the report and went through each of its recommendations "one by one."  Admin. Rec. N.T. at 636:9-21 (McNamara).[15] Much of Z.J.'s educational needs are addressed as part of general pedagogy and good classroom practices.  So rather than burden the IEP with repetitions of what is already occurring in the classroom, the Team added only those things that were specific to Z.J.  Admin. Rec. N.T. at 325:9-20 (Watson).  *See also* Admin. Rec. N.T. at 330:16-20 (Watson, "He was a pretty organized kid.  He maybe needed some help organizing his thoughts.  That was something that most of the classmates around him needed too, so we did things throughout our curriculum that would support that.").  Basically, what he really needs is more adult support. Admin. Rec. N.T. at 325:25 – 326:2 (Watson).  The IEP included the important tools he needed to help him focus and maintain attention, and those made a difference when he used them.  Admin. Rec. N.T. at 326:18 – 327:9 (Watson).[16]

### 4.   The Schmidt report.

Parents, not the School District, provided records to Schmidt.  Admin. Rec. N.T. at 523:11-12 (Schmidt).   Those records did not include the May 2015 Reevaluation Report.  Admin. Rec. N.T. at 584:14-18 (Schmidt).  *See also* Admin.

---

[15]    Kim McNamara, Colonial School District School Psychologist.

[16]    Colonial School District issued a Revision IEP, Admin. Rec. S-67, 68, that provided for executive functioning skills instruction, Admin. Rec. S-68 at 19 of 25. The September 2017 IEP, Admin. Rec. S-79, is likewise responsive to parental concerns.

Rec. S-64 at 3 of 38.  Schmidt's assistant spoke to the regular education teacher and the health teacher.  Admin. Rec. S-64 at 9 of 38.  She did not ask about instruction or curriculum.  *Id*.  Yet she indulges the canard that public school classrooms run on the oppressive Victorian model.  Admin. Rec. N.T. at 553:21-23 (Schmidt, suggesting instruction is no more than listening to lecture); Admin. Rec. N.T. at 565:21-22 (Schmidt, "just listening to directions").

Schmidt did not speak to any School District counselor or school psychologist or teacher.  Admin. Rec. N.T. at 577:19-25 (Schmidt).  She did not speak to anyone about the School District's curriculum or any details about Z.J.'s program and what's "inherent" in the public school classroom.  Admin. Rec. N.T. at 578:1-3, 622:11-14 (Schmidt).  *See also* Admin. Rec. N.T. at 650:3-13 (McNamara, discussing naturally occurring events within the curriculum). Schmidt knows nothing about the School District curriculum because she didn't ask.  Admin. Rec. N.T. at 581:10-12, 607:14-18 (Schmidt).  She did not know, for example, about a common, and actually taught, test-taking strategy of answering the easy questions first, Admin. Rec. N.T. at 685:16-20 (McNamara), and so characterized Z.J.'s test-taking approach as "disorganized," Admin. Rec. N.T. at 582:13-18 (Schmidt).   She claims she did not have permission to speak to School District staff, Admin. Rec. N.T. at 578:5-7 (Schmidt), although, her assistant, apparently, did.  Strangely, for an educational evaluation, she didn't get permission

to speak to School District staff but did get permission to speak to Z.J.'s neurologist.  Admin. Rec. N.T. at 583:5-6, 612:20-21 (Schmidt).

Schmidt didn't know the family concern about pulling Z.J. out of class for special instruction or missing instruction in the regular classroom, Admin. Rec. N.T. at 579:22 -580:15 (Schmidt), even feigning misunderstanding about the concept of time itself, Admin. Rec. N.T. at 580:10 (Schmidt).

Her report asserts that Z.J. received no speech and language services in 2014, Admin. Rec. S-64 at 4 of 38; Admin. Rec. N.T. at 584:23 – 585:8 (Schmidt), although the June 4, 2014, Speech IEP that she supposedly reviewed according to her report, provided 180 minutes Speech-Language Therapy ("SLT") per month, Admin. Rec. S-18 at 16 of 19.  Certainly the IEP does not show SLT as a "related" service, *see* 34 C.F.R. § 300.34, given it is a speech-only IEP, something Schmidt said she understood.  Admin. Rec. N.T. at 585:9-12 (Schmidt).

Schmidt also reported a pro-rated IQ score despite no subtest being spoiled. Admin. Rec. N.T. at 589:19-25 (Schmidt).  She did not use the General Ability Index, which is the proper scoring measure in the face of non-spoiled but outlier subtest scores.  Admin. Rec. N.T. at 590:10-21 (Schmidt).

She did not calculate or report grade-based norms, *see, inter alia.*, Admin. Rec. S-64 at 15 of 38; Admin. Rec. N.T. at 542:17-18, 590:23 -591:6, 592:23 – 593:1 (Schmidt), although Z.J. repeated Kindergarten and is older than his class-

level peers, Admin. Rec. N.T. at 162:13-17 (father); Admin. Rec. N.T. at 591:24-25 (Schmidt), and so is behind by one year in instructional exposure compared to his age-peers, Admin. Rec. N.T. at 644:1-16 (McNamara). *See also* Admin. Rec. N.T. at 596:18 – 599:4 (Schmidt, dialogue with hearing officer). Her report is misleading and she repeated the error in testimony. This is no mere technicality, but is "very important." Admin. Rec. N.T. at 643:24 (McNamara).[17]

Schmidt incredibly attempted to excuse her rather unprofessional reporting mal-candor by saying she reported "grade equivalents." Admin. Rec. N.T. at 591:7-19 (Schmidt). Grade equivalents are not norm-based and so makes Z.J. appear more impaired. And that's on top of the fact that grade-equivalencies are not reliable in the first place. Admin. Rec. N.T. at 599:21 – 600:7 (Schmidt); Admin. Rec. N.T. at 642:18 – 643:20 (McNamara). She also likely used the TOWL (Test of Written Language) results to the same skewing effect: she should have tried a second form in order to obtain a testable result, but chose not to do so. Admin. Rec. N.T. at 593:2-14 (Schmidt).

About the Woodcock-Johnson reading fluency subtest, Schmidt asserted that "it's very unusual to get even one wrong for most students," in contrast to Z.J.'s performance results. Admin. Rec. N.T. at 619:15-16 (Schmidt). But the assertion

---

[17]   Another hearing officer found Schmidt did the same thing in another private report for another student, who was retained and so a year older than peers, and who was participating in all regular education. That matter is on appeal before present Chambers in Civ. A. 2:19-3844-JMY.

itself, aside from its specious Z.J.-comparator-merit, means "most students" would, literally, be topping the charts.  Every student.  On a normed test.  That's weirdly unsupported, and unbelievable.

For her "update," Admin. Rec. P-20, Schmidt observed Z.J. while he was at the private school, AIM Academy.  Admin. Rec. N.T. at 561:13-18, 572:19-22 (Schmidt).  Yet she also testified that "if possible," she would not want to be observing a student she had met before.  Admin. Rec. N.T. at 609:4-7 (Schmidt). Possibly, because of the "Hawthorne effect."  But she observed him anyway after testing him.  Admin. Rec. N.T. at 620:8-10 (Schmidt).

She spoke with AIM Academy's guidance counselor and school psychologist about Z.J.'s "programming."  Admin. Rec. N.T. at 562:1-2, 566:6-11, 570:6-7 (Schmidt).  Indeed, she had questions about AIM Academy's program and so asked.  Admin. Rec. N.T. at 570:12-15 (Schmidt).  In other instances, she just accepted without question what was provided to her about AIM Academy.  Admin. Rec. N.T. at 570:21 – 571:2 (Schmidt).  Such an investigative curiosity about AIM Academy on the one hand, compared to assumptions and sloth about the school district on the other, points to process and opinion bias.

Just like her assistant, Schmidt used a "process-oriented" observation method.  Admin. Rec. N.T. at 573:9-11, 574:19-20 (Schmidt).  Basically, that means she and her assistant note whatever they want to note.  Admin. Rec. N.T. at

573:21-24 (Schmidt).   The observer is supposed to report "facts." Admin. Rec.

N.T. at 575: 506 (Schmidt).   But the reports are full of subjective assertions, *e.g.*,

"staring blankly," that are not reasonably defined, Admin. Rec. N.T. at 575:7-17

(Schmidt), or are just not possible, Admin. Rec. N.T. at 575:18-25 (Schmidt,

claiming ability to see Z.J.'s eyes after Z.J. turned away).   *See also* Admin. Rec.

N.T. at 646:25 – 647:4 (McNamara, no criteria).   In testimony, Schmidt admits the

observer was in close proximity to Z.J., Admin. Rec. N.T. at 576:4-7 (Schmidt),

but neither the observer's relative position nor its possible impact on behavior, *e.g.*,

the Hawthorne effect, was not noted in her report, Admin. Rec. N.T. at 576:8-24

(Schmidt).   *See also*, Admin. Rec. N.T. at 586:21 – 587:24 (Schmidt, discussing

implication that Z.J. is not engaged despite not knowing if he did not raise his

hand, appropriately or not, given the question asked).   And also note that, although

supposedly being a Joe Friday interlocutor of "just the facts," the observer chose to

relate just two questions asked by the school district's teacher, despite more than

two being asked; those two questions just so happen to suggest Z.J. was off-task at

each moment.   Admin. Rec. N.T. at 588:17-20 (Schmidt).   There was no effort

whatsoever to be objective and clinical.[18]

---

[18]     This is Schmidt's report, not the School District's.   She conducts it as she
sees fit.   It is not up to the School District to reach out to her to make sure she asks
the right questions (or, in this case, any questions at all) and seeks out validating
(or contradicting) information.   Parents' questions to contrary effect, *see, e.g.*,
Admin. Rec. N.T. at 610:5-15 (Schmidt); Admin. Rec. N.T. at 674:1-4

Schmidt has no school experience, whether as teacher or administrator or psychologist.  Admin. Rec. N.T. at 582:4-12 (Schmidt).  Schmidt did not use educational criteria for her "diagnoses," but rather used the Diagnostic and Statistical Manual of Mental Disorders ("DSM") - IV.  Admin. Rec. N.T. at 593:20.  She didn't bother to even get that one right, failing to use the current, DSM-V.  Admin. Rec. N.T. at 683:2-4 (McNamara).  Her Specific Learning Disability diagnosis is based solely on standardized assessment.  Admin. Rec. N.T. at 591:11-12 (Schmidt).  *See* 22 Pa. Code § 14.125 (setting criteria and process to determinate specific learning disability).  *See also* 20 U.S.C. § 1401(30); 34 C.F.R. § 300.8(c)(10).  Her language disorder diagnosis (this is not an IDEA defined disability) does not acknowledge, what she admits to knowing: that the Speech Therapist who provided direct services to Z.J. previously found he was to be exited from the service.  Admin. Rec. N.T. at 595:13-22 (Schmidt).

### 5.   Conclusion.

The hearing officer's findings are sound.  There are no grounds within the standard of review to reverse his decision.  Z.J. progressed grade-to-grade in regular education and in the general curriculum.  The private expert is not credible.

---

(McNamara), are pap.  Her report, whether of honest virtue or not, is her report, including its dubious bits.

And just adding "more stuff" to the IEP, which really is what Plaintiffs' argument comes down to, is not the standard for a FAPE.[19]

## III.    FINAL CONCLUSION.[20]

Understandably, Plaintiffs wish Z.J. had even better success, or that success were a less winding, uphill path for him and them.  But it's success nonetheless, and based on his grade-to-grade progress, Z.J. will surely go on being successful in life, more so than many.  Wishes don't make liabilities.  Judgment should be entered in favor of Defendant, Colonial School District.

                              SWEET, STEVENS, KATZ & WILLIAMS LLP


Date: October 31, 2019          By:  /s/ Karl A. Romberger, Jr.
                                Karl A. Romberger, Jr., Esquire, Atty. I.D.
                                #60636
                                331 Butler Avenue, P. O. Box 5069
                                New Britain, Pennsylvania  18901
                                (215) 345-9111 – Office
                                (215) 348-1147 – Facsimile

                                Attorneys for Defendant,
                                *Colonial School District*

---

[19]    Plaintiffs' Section 504 and ADA arguments rests on the FAPE decision.  For this reason, judgment on the Section 504 and the ADA claims should be denied, too.

[20]    This brief is already long.  Because the hearing officer's decision is correct, Plaintiffs' other arguments are mooted.  Oral argument, Defendant respectfully suggests, would be an efficient means to deal with any questions.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ZACHARY J., through his parents,** | : | **Civil Action** |
| **JONATHAN and JENNIFER J.,** | : | |
| | : | **No. 19-0652** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **COLONIAL SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant.** | : | **Hon. John Milton Younge** |

### CERTIFICATE OF SERVICE

I, Karl A. Romberger, Jr., Esquire, counsel for Defendant, hereby certify that a true and correct copy of the Defendant, Colonial School District's Cross-Motion for Judgment on the Administrative Record, together with its Combined Brief and proposed form of Order, is available and was served through the Court's ECF filing, with a courtesy copy being provided by U.S. First Class Mail to:

John W. Goldsborough, Esquire
McAndrews Law Offices
30 Cassatt Avenue
Berwyn, PA  19312

SWEET, STEVENS, KATZ & WILLIAMS LLP


Date: <u>October 31, 2019</u>          By:  <u>/s/ Karl A. Romberger, Jr.</u>
                                       Karl A. Romberger, Jr., Esquire, Atty. I.D. #60636
                                       331 Butler Avenue, P. O. Box 5069
                                       New Britain, Pennsylvania  18901
                                       (215) 345-9111 – Office
                                       (215) 348-1147 – Facsimile

                                       Attorneys for Defendant,
                                       *Colonial School District*