**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ZACHARY J., through his | : | |
| Parents JONATHAN and | : | |
| JENNIFER J. of Lafayette Hill, PA | : | |
| | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. 19-0652 |
| | : | |
| COLONIAL SCHOOL DISTRICT | : | |
| 230 Flourtown Rd., | : | |
| Plymouth Meeting, PA 19462 | : | |
| | : | |
| Defendant | : | Hon. John Milton Younge |

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD**

Zachary J., a minor child with disabilities, and his Parents, Jonathan and Jennifer J. ("Plaintiffs" or the "Family"), hereby submit this Reply Brief in further support of their Motion for Judgment on the Administrative Record, and in answer to the District's Opposition Brief (ECF doc. 19-1).

**I.     ARGUMENT**

   **A.     THE HEARING OFFICER'S ANALYSIS AND DECISION REGARDING
            THE STATUTE OF LIMITATIONS WAS FLAWED AND INCORRECT.**

The District's attempt to defend the Hearing Officer's decision regarding the statute of limitations remains entirely unavailing.  Opposition Brief at 1-7.  In addition to the arguments set forth in the Family's Complaint and Memorandum of Law in Support of their Motion for Judgment on the Administrative Record, incorporated here in full by reference, the Family submits the following.

The Family filed within two years of the date on which it knew or should have known ("KOSHK") of the denial of FAPE. Contrary to the District's arguments, the Family's merely communicating with the District about Zachary's issues did not establish that the Family was on notice that FAPE was being denied (i.e., the injury); instead, Zachary's parents' correspondence is evidence of caring parents communicating with the school about the student's needs. The Family was of course aware – long before that – that Zachary had needs; indeed, he had an IEP in place for many years.

But that does *not* reflect that the Family was aware at the relevant time that what the District was providing was fully not *appropriate*, especially when, as fully established at the hearing, the Family was reassured again and again that various issues not explicitly addressed in the IEPs were in fact being properly addressed by competent and knowledgeable professionals at the school. The Family believed these assurances and should not be punished for trusting these representations. Plainly, throughout the hearing, various teachers agreed that they regularly handled many issues that were not in the IEPs -- implying that they, too, believed that that was appropriate. E.g., N.T. 404-405 (describing teachers determining on an ad hoc basis, without reference to the IEP, whether Zachary should have pull-out support for math when made necessary by his executive functioning issues, although no such support was included in the IEP). Further, the date upon which the Family finally became aware that the District was not meeting Zachary's needs overall *is* definitionally the date when they became aware that a FAPE was being denied – and actual knowledge is the same as whether the "knowledge was known" – contrary to the odd, fussy, semantic arguments of the District. ECF Doc. 19-1 (District Cross-Motion) at 5. The Family had no reason to believe, until they received the Independent Educational Evaluation

("IEE"), that a positive behavior support plan, extended school year, or other specifics about which they are not experts, should have been provided. Id. at 6.  The mere fact that those services were not provided did not put the family on notice that a FAPE was being denied; their impression from the District professionals was, as they testified, that such things were not needed. They had no reason to know the precise nature of Zachary's needs, and that his IEPs were not appropriately meeting those needs, until receiving the IEE. Id.  The fact that his IEPs did not include all of Zachary's unmet needs, whatever they were, did not put the Family on notice that the District was denying him a FAPE – even though it was.  The Family remained unaware until the independent evaluation educated the Family on all of Zachary's unmet needs.

At the very *earliest*, the Family became aware that the District was denying Zachary FAPE on the date that Zachary expressed that he wanted to kill himself because of how "lost" and "behind" he felt "in school."  But the actual date when the Family knew of the denial of FAPE was the date when Zachary's Parents received the IEE of Dr. Kara Schmidt.  In any event, *both* dates were within two years of the filing of the complaint.  Therefore, under G.L. v. Ligonier Valley School Dist. Auth., 802 F.3d 601 (3d Cir. 2015), the complaint was timely and Zachary is entitled to a "complete remedy" for the District's violations for the entire period of educational deprivation, without reference to IDEA's limitations period. Id. at 625-26.

The G.L. court made entirely clear, at numerous points in its decision, that the KOSHK date runs from the date that parents discovered or should reasonably have discovered their child's *educational injury*.  802 F.2d at 604 (IDEA's statute of limitations language "described the due process complaint as alleging an *injury* that occurred not more than two years *before* the reasonable discovery date") (first emphasis added, second in original); id. at 605 (IDEA imposes

a "two-year filing deadline for a due process complaint after the reasonable discovery of an *injury*") (emphasis added); id. at 614 ("the text [of IDEA] is clear that Congress eschewed the occurrence rule in favor of the discovery rule by hinging both [20 U.S.C.] § 1415(f)(3)(C) and § 1415(b)(6)(B) on the date the parents 'knew or should have known' of the *injury*") (emphasis added).

In direct contravention of this controlling language from G.L., the Hearing Officer found that the "knew or should have known," or "KOSHK," date is the date that a school district takes a particular "*action*," as opposed to when the parents reasonably should have discovered that the "action" had caused an *educational injury* to the student.   (Pre-Hearing Order, May 3, 2018). The District argues that this decision was correct, and that the KOSHK date in the present case are the dates that the District took particular *actions* or failed to take certain others.  This analysis – which charges parents with knowledge of a school district's statutory violations *the moment they occurred,* or *the moment they should have occurred but did not* – is clearly incorrect, and is directly contrary to G.L.

Judge Kearney in E.G. v. Great Valley School Dist., 2017 WL 2260707 (E.D. Pa. May 23, 2017) – a case discussed in the Family's opening brief but not discussed or even cited by the District in its Opposition Brief – strongly rejected the Hearing Officer's unsupported theory that a parent "knows or should know" about a school district's violation of IDEA at the very second that the school district takes a particular action, including by issuing a document such as an IEP.  In that matter, a Hearing Officer barred as untimely the parents' claims for alleged violations of IDEA that occurred prior to the date two years preceding the filing of the Due Process complaint. Id. at *6.  The Hearing Officer, as the District unconvincingly urges in the present case, found that

the parents "had contemporaneous knowledge of the District's actions as they occurred[.]" Id. Judge Kearney strongly rejected the school district's argument that the KOSHK date was when the parents knew or should have known of the "*action*" taken by the District; rather, the controlling date is when the parents knew or should have known ("discovered," as per G.L.) that the school district's actions "violated their child's right to a FAPE." Id. at *7.  The court noted that the school district's and hearing officer's "contemporaneous knowledge" interpretation would "render the discovery rule obsolete[,]" because parents would be deemed to know of a school district's violations of IDEA prior to knowing whether those violations deprived their child of a FAPE. Id. at *8.  The court discussed with approval the decision in Damarcus S. v. District of Columbia, 190 F. Supp.3d 35 (D.D.C. 2016), where the court explicitly adopted the Third Circuit's reasoning in G.L., and held that the KOSHK date inquiry must examine the particular violation asserted, " 'and the parents' ability to recognize it.' " E.G., 2017 WL 2260707 at *9 (quoting Damarcus S., 190 F. Supp.3d at 45).  The E.G. court then remanded the case to the Hearing Officer to conduct a "fine-grained analysis" regarding *not* when the parents knew of the school district's "action," but when the parents knew or should have known ("discovered," as per G.L.) that that action deprived the child of a FAPE.  Id.

The decision of the Ninth Circuit Court of Appeals in Avila v. Spokane School District 81, 852 F.3d 936 (9th Cir. 2017), adopting the reasoning of G.L., is similarly clearly contrary to the Hearing Officer's decision regarding the KOSHK date.  Merely being presented with a document such as an IEP that does not contain things that it is later revealed it should have, or that contains things it is later revealed it should not have, cannot possibly somehow automatically trigger the running of the statute of limitations.  Nor can parents' knowledge of individual events, rather than

the significance of them in the eyes of special education professionals. Rather, taking into strong account parents' *not* being experts about disabilities or special education, the KOSHK date is instead triggered when the parents knew or reasonably should have known ("discovered," as per G.L.) that their child has been deprived of a FAPE through the school district's actions, i.e., when they know or should know that the school district's program has caused their child an educational *injury*. G.L., 802 F.3d at 625. This analysis is clearly correct and, indeed, *mandated* under G.L., and yet was entirely ignored by the Hearing Officer.

In attempting to argue that the Hearing Officer's analysis was correct, the District relies almost entirely on cases outside of the IDEA/Section 504 context that nevertheless support the *Family's* interpretation of the statute of limitations. For instance, the District cites Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380 (3d Cir. 1994). District Opposition Brief at 5. In Oshiver, the plaintiff, who had been dismissed from her job due to alleged discrimination, brought federal claims of employment discrimination, and the district court dismissed the claims on the basis of the statute of limitations. Id. at 1384. On appeal, the Third Circuit applied the discovery rule to the plaintiff's federal claims, and specifically noted that the accrual date for purposes of the statute of limitations is not the date on which the wrong occurs, but the date of *discovery of injury*:

> [T]he accrual date *is not the date on which the wrong that injures the plaintiff occurs, but the date on which the plaintiff discovers that he or she has been injured*.... There will, of course, be times when the aggrieved person learns of the alleged unlawful employment practice, for example, at the very moment the unlawful employment practice occurs; in such cases the statutory period begins to run upon the occurrence of the alleged unlawful employment practice. However, there will also be occasions when an aggrieved person does not discover the occurrence of the alleged unlawful employment practice *until some time after it occurred*. The discovery rule functions in this latter scenario to postpone the beginning of the statutory limitations period from the date when the alleged

6

unlawful employment practice occurred, to the date when the plaintiff actually discovered he or she had been injured....   In either scenario, once the plaintiff's cause of action has accrued, that is, once the plaintiff has discovered the injury, the statutory limitations period begins to run and the plaintiff is afforded the full limitations period, starting from the point of claim accrual, in which to file his or her claim of discrimination....   "[I]t is entirely clear that the discovery rule if applicable gives the plaintiff the entire statute of limitations period in which to sue, counting from the date of discovery....".

Id. at 1385-86 (emphasis added, citations omitted).  The court repeatedly stated that, pursuant to the discovery rule, the statute of limitations begins running on the date that the plaintiff knew, or reasonably should have known, that she was *injured*.  Id. at 1386 ("A claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of an *injury*.") (emphasis added); id. ("the 'polestar' of the discovery rule is not the plaintiff's actual knowledge of *injury*, but rather whether the knowledge was *known*, or through the exercise of reasonable diligence, knowable *to the plaintiff*") (emphasis added).

The Hearing Officer's analysis in the present case is the exact opposite of the court's analysis in Oshiver.  The Hearing Officer did not analyze when the Family knew or should have known that Zachary suffered an educational *injury* due to the District's actions, but instead looked *only* at when the District took specific "actions," without regard to when the *injury* caused by those actions became apparent.  (Pre-Hearing Order, May 3, 2018). The fact that the Parents accepted IEPs that did not address all of Zachary's needs – a factor pointed to by the Hearing Officer, Pre-Hearing Order at 8 – was fully explained at the hearing, in that they were assured that such needs would be fully addressed by the school and did not need to be in the IEPs.  That is, the failure to include these needs from the IEPs did not inform the Parents that FAPE was being denied at that time, contrary to the finding of the Hearing Officer that just because the Parents

7

were aware of the content of the IEPs necessarily means that Parents were somehow then on notice that the District was denying FAPE to Zachary.

As Judge Kearney observed in E.G., such an analysis entirely eviscerates the discovery rule in educational cases, because parents will be deemed to "know" about the significance of a school district's actions – or inactions – at the exact moment that they are aware of the actions – or inactions – without being provided any opportunity to *discover* whether such actions *result* in actual *educational injury* to the student through a deprivation of FAPE. E.G., 2017 WL 2260707 at *8. This is entirely incorrect, especially since parents may not *obtain* relief for a school district's statutory violations *unless and until* those violations cause substantive harm to the child, thus depriving the child of a FAPE. C.H. v. Cape Henlopen School Dist., 608 F.3d 59, 66-67 (3d Cir. 2010) (a child may be entitled to compensatory education for a violation of IDEA only if it results in a substantive harm, i.e., the loss of educational opportunity or benefits). A child is not substantively "injured" when his parents are merely aware that certain issues are not addressed in IEPs or are provided otherwise inappropriate documents, especially where, as here, the parents are assured that additional interventions outside the IEPs will occur; rather, the child is injured when the parents discover that those documents – in this case, inappropriate IEPs – *result* in an *actual educational deprivation*.[1]

---

[1] The Oshiver court found that the plaintiff knew or reasonably should have known of her injury on the date she was informed of her dismissal: "Simply put, at the moment the law firm conveyed her dismissal to her, Oshiver became aware (1) that she had been injured, i.e., discharged, and (2) that this injury had been caused by another party's conduct." Id. at 1391. The present case is entirely different, as the harm caused by the defendant's actions was not, as in Oshiver, immediately apparent, but rather manifested itself *only* after Zachary expressed suicidality in despair over how stupid he felt in school, *and* only after Dr. Kara Schmidt provided her IEE. Those dates, of course, were well within two years of the filing of the Due Process complaint.

Moreover, the Hearing Officer, who was obliged to follow Pennsylvania law, did not do so.  ODR Dispute Resolution Manual at 1, § 101B, § 102D; at 23, Chapter 7; at 29, Chapter 8; at 32, Chapter 9; at 35, Chapter 10; and at 37, Chapter 11.   In his statute of limitations determination, the Hearing Officer failed to follow – or even discuss or consider – Nicolaou v. Martin, 195 A.3d 880 (Pa. 2018), which fully discussed the discovery rule and has general applicability in statute of limitations matters under state law.

In Nicolaou, a medical malpractice case, the Pennsylvania Supreme Court stated that "a layperson is only charged with the knowledge communicated to him or her by the medical professionals who provided treatment and diagnosis", which in the special education context would translate into information provided by school professionals.  Id. at 893.  The parents cannot have known otherwise, when the school professionals repeatedly reassured them that Zachary's education was appropriate, any earlier than Dr. Kara Schmidt's IEE report.  Further, the court stated that "the financial cost of a particular medical procedure which could have served to alert a plaintiff of his injury and its nexus to the defendant's conduct is a permissible factor to consider in determining whether a plaintiff exercised reasonable diligence" in identifying whether an injury has occurred.  Id. at 894. Of course, in the current special education context, the procedure in question that alerted the Family to the District's denying FAPE to Zachary was the costly IEE performed by Dr. Kara Schmidt.  The parents cannot be blamed for failing to pay for and obtain that expensive evaluation at an earlier date.

Significantly, and even beyond this expansive view of the discovery rule to afford injured parties a full opportunity to seek redress for injury, the Nicolaou court indicated that it is prepared, in an appropriate case where the issue has been raised in the lower courts, to "join the

majority of jurisdictions that require specific medical evidence supporting a cause of action to commence the statute of limitations." Id., at 892-3 n.14. In the current federal context, this Court must predict the path in which the Pennsylvania courts are traveling on this specific issue. That is, here, this Court is obliged to consider and to predict what Pennsylvania *will do* on this issue, and hold that until *specific professional evidence* was provided to the parents (here, the IEE), they were not on notice that educational harm/injury had occurred to Zachary, and that the statute of limitations only began to run once that evidence was provided to them.

The matter should be remanded to the administrative process for a determination of Zachary's right to relief on the substantive merits regarding the time periods excluded by the Hearing Officer.

### B.   THE HEARING OFFICER SHOULD HAVE FOUND THAT THE DISTRICT DENIED A FAPE.

The Hearing Officer seriously erred in affording the educational recommendations in Dr. Schmidt's IEE "very little weight," based on her not "asking" Zachary's teachers about Zachary's program, and the Hearing Officer's unsupported conclusions about the contents of her report. Decision at 10-11. Dr. Schmidt is a highly experienced and respected neuropsychologist, and her evaluation methods and report were both entirely comprehensive and proper. The Hearing Officer committed clear error in giving almost no weight to Dr. Schmidt's comprehensive report, and its conclusions and recommendations, without any proper basis.

The parents went to Dr. Schmidt for this comprehensive and expensive private evaluation because their son expressed suicidality due to feeling lost and behind in school in November of 2016. N.T. 38, 161, 390. The District's efforts to cast the parents' hiring of Dr. Schmidt as nefarious and exclusively for the purpose of litigation, both at the hearing and in the Opposition

Brief, are and were entirely inappropriate, especially in light of this deeply concerning situation – as well as the extremely high degree of difficulty Zachary was encountering in the District.

Dr. Schmidt's evaluation took place between February 28, 2017 and March 23, 2017, and her final report was issued on or about May 11, 2017. The Parents promptly provided a copy of the report to the District, and it was discussed at the next IEP meeting on May 19, 2017, which was improperly back-dated by the District to avoid the fact that it was held more than one year after the prior one. N.T. 283-286. Dr. Schmidt's evaluation was thorough, assessing all areas of suspected need including cognition, verbal functioning, visuospatial functioning, attention and executive control, processing speed, learning and memory, motor skills, academics, and social, behavioral, and emotional functioning. Dr. Schmidt's evaluation procedures also included a comprehensive review of Zachary's available educational records, a school observation in the District (in two classrooms, including speaking with two teachers) and one at AIM Academy, and input from the parents and Zachary's teachers through rating scales. Dr. Schmidt ultimately concluded that Zachary was a child with an Other Health Impairment ("OHI") due to Attention Deficit Hyperactivity Disorder ("ADHD"); a Specific Learning Disability ("SLD") in reading fluency and essay writing/written language; and a Language Disorder characterized by weakness in comprehension (auditory processing, comprehension of instructions, verbal attention/working memory) and production (articulation, organization of thoughts/structure). (Exhibits P-5, P-12). Dr. Schmidt recommended that Zachary be classified under the disability category of Other Health Impairment ("OHI") due to issues with disorganization, distractibility, inattention, executive dysfunction, impulsivity, and hyperactivity, as well as performance-based and social anxiety. (Exhibit P-12).

The classroom observation portion of the report was, in particular, highly concerning, demonstrating Zachary's high degree of inattention, distraction, off-task behavior, lack of participation and focus, and random, disruptive calling out, to the extent that Dr. Schmidt's assistant, Lauren Fenning, a certified Pennsylvania Special Education teacher, brought it to Dr. Schmidt's attention as extremely alarming. (P-12 at 5-9; N.T. 528-529, 558-560). Dr. Schmidt made a variety of reasonable recommendations for specially designed instruction, accommodations, supports, and programming that Zachary required in order to make meaningful educational progress in school. (Exhibit P-12.)

The Hearing Officer plainly erred in stating that Dr. Schmidt's IEE revealed little information that the District had not already found, that she had not consulted Zachary's teachers, and that the District's IEPs already followed her recommendations. Exhibit B at 15. These statements are demonstrably incorrect and are entitled to zero deference, as detailed in the Parents' Memorandum of Law. Dr. Schmidt sought, and obtained, input from Zachary's teachers via rating scales, two classroom observations (one in the District conducted by her assistant, and one at AIM Academy, Zachary's private specialized school for students with learning disabilities, that she conducted herself), and discussions with Zachary's teachers at both locations following the observations (N.T. 522-524, 527-528, 558-560, 561-568; P-12, at 6-9, 19). Her report revealed much that the District had not already found, and the District's IEPs did not already anticipate her recommendations.

The District's Opposition Brief is often disrespectful, inappropriately colloquial, and at times outright insulting. This counseled rudeness reflects the inadequacy of the positions advanced by the District. See Opposition Brief at 26 (attributing "sloth" to Dr. Kara Schmidt); 27

(of her IEE: "There was no effort whatsoever to be objective and clinical."); at 27-28 n.18

("Parents' questions to contrary effect…are pap. Her report, whether of honest virtue or not, is

her report, including its dubious bits."); at 28-29 ("The private expert is not credible. And just

adding 'more stuff' to the IEP, which really is what Plaintiffs' argument comes down to, is not the

standard for a FAPE."); at 29 ("Wishes don't make liabilities.").

 The District opens its discussion of Dr. Schmidt's IEE by engaging in wild inaccuracy.

Among numerous others, Dr. Schmidt's IEE contained the following recommendation:

> 10.)  Given Zach's presentation, the following accommodations are recommended
> to assist Zach in the classroom setting:
>  …
> d.  Active learning settings and the use of a hands-on approach will be most
> beneficial in school.  Zach may learn best when small amounts of new information
> are presented at a time, with breaks interspersed throughout learning sessions.
> This strategy will be more effective than attempting to learn a large amount of
> information at once (i.e., "cramming" before a test).

Exhibit P-12 (IEE) at 23.  At the hearing, Dr. Schmidt was asked what she meant by that specific

recommendation, and she answered:

>  Yes. When we went over the different neurocognitive needs, for example,
> Zach did very well in terms of hands-on visual multisensory activities. He showed
> more enthusiasm, attention, and he scored above average.
>  When things are multisensory, and he's active, it really helps his attention
> regulation and then coding and mastery of new material.
>  So just as an example, he's probably a student who will do better if he had
> a science lab and he was able to experience the information ***versus sitting in a
> classroom and listening to a lecture*** verbally on the same information.

N.T. 553 (emphasis added).

 The District opens its discussion of Dr. Schmidt's report by citing to only the emphasized

example portion, out of context, and grossly mischaracterizes it in several ways.  Initially, the

District wrongly attributes the testimony to Ms. Lauren Fenning, Dr. Schmidt's assistant who

performed the two District classroom observations, as Dr. Schmidt testified she often does for Dr. Schmidt's evaluations. However, Ms. Fenning did not testify. The District states that in this passage, Ms. Fenning "indulges the canard that public school classrooms run on the oppressive Victorian model." District Opposition Brief at 23, citing N.T. 553. That is absolutely false, and there is no support whatsoever for it, whether in the cited text or anywhere else. Then, in a parenthetical, the District characterizes this as: "Schmidt, suggesting instruction is no more than listening to lecture." Again, that is completely wrong, as shown by the context in the block quote, though at least the attributed speaker has been corrected this time. In further purported support for its mischaracterization, the District cites to a second passage, stating that it shows that Ms. Fenning believes instruction in public schools is "just listening to directions." Again, that is utterly false and without any conceivable support. Instead, in the second cited passage, Dr. Schmidt was testifying about what she observed when she visited AIM Academy, the specialized school for students with language-based learning disabilities that Zach now attends:

> Q.      Did you see, as it relates to executive functioning, as issues arose in the classroom, did you see any sort, did you see the Teacher employ any of the kinds of strategies that you were recommending as far as active instruction of executive functioning?
>
> A.      Yes. Particularly in relation to his reading comprehension and answering questions during the beginning part of the observation. Sometimes Zachary would rush and give short answers and he was given scaffolding and cueing and modeling to go back and expand his answers. And also to use models. Because he does very well when he has tangible models in front of him.
>
> HEARING OFFICER FORD: He does very what?
>
> THE WITNESS: He does very well when he has visual tangible models versus *just listening to directions*. So he was encouraged, for example, to open his book and check his answers to really talk through things, like vocally talk through things, make sure they make sense before he shares things out loud with the group.

N.T. 565-566 (emphasis added).

The District falsely states that Dr. Schmidt knows nothing about the District curriculum. District Opposition Brief at 23. However, Dr. Schmidt sent her assistant to the two-classroom District observation which included speaking with the two District teachers, sought and obtained multiple rating scales from both District teachers, spoke with the parents, and read myriad educational records provided to her including multiple District IEPs and District report cards, in addition to testing Zachary. Thus, the District and Hearing Officer were incorrect about Dr. Schmidt's understanding of Zachary's program. It was not based on assumption, as they claim, but rather on her review of the District records, including Zachary's IEPs, which are supposed to fully explain the supports, services, and specially designed instruction that Zachary is to receive. What the Hearing Officer seems to require is some sort of detailed knowledge of the day-to-day programming, or overall curriculum, beyond what is included in the IEP – but that is not possible for any independent evaluator.

It is a mischaracterization to state that the reason Dr. Schmidt stated that Zachary's approach to test-taking was disorganized was based on her lack of knowledge of a District-taught test-taking strategy of filling in the easy questions first. Opposition Brief at 23. She instead testified that his approach to getting *anything* down on paper was disorganized, in part because he did not track left to right, top to bottom, as most of the rest of us do. N.T. 533. She testified that his disorganized and inattentive approach was across all subjects and all-pervasive, and that he required strategies to address this that were incorporated into the teaching and testing of all subjects, not just math test-taking. N.T. 556.

The reason Dr. Schmidt did not have Parents' permission to go to the school and speak to District staff, while her assistant did, and while she had permission to phone Zachary's

neurologist, is no mystery, contrary to the District's odd assertion.  Opposition Brief at 23-24.

She directly answered that here, the family was paying for the evaluation and had not authorized

the expenditure for that extra travel and visit.  N.T. 579.  Further, the District did not itself ever

attempt to contact her, even after the family delivered her comprehensive IEE to the District, to

discuss how to craft appropriate IEPs based on it.  The District did not even obtain permission

from the family to contact her.  N.T. 610.

It is false that, as the District asserts, Dr. Schmidt was unaware of Zachary's anxiety about

being pulled out of the class for special instruction and missing regular instruction, which also

made it clear to the other students that he was different.  District Brief in Opposition at 24.

Instead, she was well aware of these concerns.  N.T. 609.  Obviously, Dr. Schmidt did not

"feign[] misunderstanding about the concept of time itself" on N.T. 580, but was instead reacting

to a particularly unclear and poorly worded question by the District's counsel, which had

confused her, particularly regarding how much time he was referring to.  N.T. 579-580.  Although

the District is correct to observe, as it did at the hearing, that she mistakenly thought Zachary had

not continued to receive speech and language services limited to the pronunciation of the /r/ sound

in 2014 (which she acknowledged he did receive in 2013 and 2015), see N.T. 584-585 and P-12 at

4, this is an extremely minor and technical error that has no overall effect, especially given that

this was not the most critical of Zachary's many disabilities and was, soon thereafter, dropped

entirely from his IEP.  Opposition Brief at 24.

As Dr. Schmidt fully explained, the reason she offered a pro-rated WISC-V score

("independent of the influences of processing speed") as well as one that was not pro-rated, P-12

at 9, was not that a subtest was spoiled, contrary to the District's accusation.  Opposition Brief at

24.  Instead, as she testified:

> A    This is just done in addition to, not in lieu of.
> Q    And to clarify your answer, it's because was not a spoiled
> subtest, right?
> A    No.  It was not a spoiled subtest.  But it was a subtest that reflected
> his processing issues.  And when you compute overall IQ on the WISC, one of the
> subtests that is part of the overall computation is coding, which he struggled with.
>      So all I'm doing here is showing the difference when coding is not there.
> In no way was it instead of.  They're both in the average range, but he does get
> five points higher when processing speed is included.
> Q    And do you know what the general ability index is, I'm sure, correct?
> A    I do.  That's a different score that takes out working memory and
> processing speed.
> Q    And is there a reason why you wouldn't calculate the G-A-I in this
> case?
> A    I'd be happy to calculate it.  But the reason why I did this here, again,
> is that the processing speed was the outlier here.  Again, it's not that it was
> contaminated.  It's an outlier.  So just to show the difference when processing
> speed isn't there because his working memory was within the average range.

N.T. 589-590.

Dr. Schmidt's testing was normed by age, not grade.  As she explained, she did so because

some of the GORT tests were only normed to age; however, this did have a disadvantage, because

Zach had repeated kindergarten, so was one year older than most students in his grade.  Although

she provided non-normed grade equivalents as well, she discussed that in her testimony fully, and

the District's critique is unwarranted.  Opposition Brief at 25; N.T. 591-593, 598-601.

There were unusual inconsistencies in Zachary's test results for reading.  In contrast to the

relatively normal scores on his Woodcock-Johnson IV letter word identification and spelling

subtests (in the 62nd and 65th percentiles, respectively), he had a very low scaled score of 62 on

the sentence reading fluency subtest, which is below the first percentile (specifically, 0.5%),

placing him at a grade equivalent of 1.3.  This timed subtest is of the ability to read very simple

sentences quickly and silently and to judge whether they are true or false.  Dr. Schmidt explained

this clearly in her report, giving examples:

> It is concerning that Zach's word reading and decoding skills are age
> appropriate on single word structured activities and that his ability to attend to and
> process the accuracy of simple sentences is poor. He worked very slowly and
> made numerous inattention/accuracy errors (e.g., A bird can fly (No), A table has
> six arms (Yes), An eagle is a bird (No), Pilots fly red bikes (Yes), A door may
> have a lock (No), A hat goes on your foot (Yes)).

P-12 at 15.  In her testimony, Dr. Schmidt explained that Zach's problems with comprehension

affected his accuracy in this test:

> [I]f you look at the 62, the sentence reading fluency is not just time, but
> accuracy.
> And *it's very unusual to get even one wrong for most students*, and he
> got many wrong.  So it's not just fluency, that the comprehension is coming into
> play there, too, even though it says fluency.

N.T. 619 (emphasis added).  In its Opposition Brief, again without examining this context at all,

the District quotes only the emphasized passage, then argues hyperbolically:

> But the assertion itself, aside from its specious Z.J.-comparator-merit, means
> 'most students' would, literally, be topping the charts.  Every student.  On a
> normed test.  That's weirdly unsupported, and unbelievable.

Opposition Brief at 26.  Thus does the District strangely believe that its own students would

typically answer even one of these questions as did Zachary -- a very poor reflection on the

District indeed, as well as upon its own attention.

The District criticizes Dr. Schmidt for conducting the follow-up classroom observation at

AIM Academy herself rather than sending her assistant, Ms. Femming, who had earlier conducted

the District classroom observation.  Opposition Brief at 26.  However, as answered above, the

District criticized Dr. Schmidt for not conducting the District classroom observation herself.  This

is inappropriate; the District cannot have it both ways.  The IEE report, P-12, was dated May 11,

2017, and incorporated the findings of the District classroom observation, while the follow-up

AIM visit, P-20, occurred on March 15, 2018. Dr. Schmidt explained that this 2018 visit to AIM

was specifically requested by, and clearly paid for by, the family to make sure AIM was an

appropriate placement for him, and to see how he was doing there:

> Q      Why did you go out to AIM to observe?
> A      Because the family asked me to go out to observe his program to
> see if it was appropriate and to see what his attention was like.
> It was specifically, I believe, related to seeing how appropriate the
> program was and his placement in general.
> As part of the Evaluation, we hadn't seen Zachary at AIM, the initial
> Evaluation.

N.T. 572-573. Plainly, since her follow-up visit had a different purpose, and was conducted well

after her IEE was finished, the IEE cannot have suffered from "opinion bias" based on Dr.

Schmidt's having spoken with the psychologist and counselor at AIM Academy but not those in

the District, contrary to the District's current position. Opposition Brief at 26 (accusing Dr.

Schmidt of "assumptions and sloth" in her approach to the District).

The observational method in the classroom of a more ethnographic process-oriented

narrative by Lauren Fenning is the next target of the District's critique. However, the arguments

against it are largely semantic. Every observation by a human of an objective event is colored by

subjectivity in multiple ways. However, the District demands only "objective and clinical"

"facts." Opposition Brief at 27. This is, in short, impossible, and even the more rigid and

structured coding systems for classroom observation by school psychologists in real time that the

District would apparently find more acceptable must (and usually do) acknowledge that. And this

extremely high level of specificity and attention to detail is, in particular in this unusual case,

entirely unnecessary, given the alarming lack of engagement by Zachary that could have been observed by anybody.  It was not subtle.

Footnote 10 on page 10 of the Opposition Brief, accuses Parents of referring to some sort of propriety program of Direct Instruction.  That, however, is utterly false.  Parents never referred to any proprietary program of Direct Instruction, and their use of capital letters does not so indicate.  While there are a wide variety of proprietary programs that use Direct Instruction in various forms, Direct Instruction itself, as defined in the Family's memorandum / opening brief, is not even remotely a proprietary program and falls squarely within the concept of peer-reviewed/research-driven Specially Designed Instruction (SDI).  Interestingly, the District cites nothing to back up its statements.  Moreover, both sides' attorneys and witnesses used the term "direct instruction" repeatedly throughout the hearing without any such confusion, all apparently understanding the term as here explained, not in the way the District seems to understand it.  See, e.g., N.T. 99, 100, 129, 198, 217, 291, 298, 347, 348, 354 (in vol. 2); N.T. 427, 428, 429, 474, 483 (in vol. 3); N.T. 540, 672, 673 (in vol. 4).

The Third Circuit has held that "[w]hether an IEP is appropriate for the individual for whom it is devised is a mixed question of fact and law," thus allowing for plenary review of the Hearing Officer's determination on that issue.  Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1042 (3d Cir. 1993); Wexler v. Westfield Bd. of Educ., 784 F.2d 176, 181 (3d Cir. 1986).  While the District cites K.D. by and through Dunn v. Downingtown Area School Dist., 904 F.3d 248, 254 (3d Cir. 2018)), Opposition Brief at 8, for a contrary position, it is submitted that the Fuhrmann/Wexler approach is plainly superior.  While K.D. did not follow the seminal cases on this issue, it did so without analysis or rationale.  It should now be beyond

dispute that IEP issues in IDEA cases are both legally and factually complex, usually with competing, highly credentialed experts.  As such, treating the appropriateness of an IEP as a simple, fact-based inquiry severely diminishes the underlying legal complexities of determining the full legal appropriateness of an IEP.  Also contrary to the position of the District, the law is clear that fact-finders should consider evidence that post-dated the creation an IEP which bears upon the reasonableness of that IEP.  See Susan N. v. Wilson School District, 70 F.3d 751 (3d Cir. 1995), countering position in Brief in Opposition at 8.

The District states that grade-to-grade progression is "compelling" proof of a FAPE.  Brief in Opposition at 9.  But that is not so, and this is a dramatic overstatement that is contrary to established authority.  Both Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176 (1982) and Endrew F. v. Douglas County School District RE-1, 137 S. Ct. 988 (2017), were *explicit* in holding that advancing grade-to-grade alone does *not* establish that FAPE is provided.  Rowley, 458. U.S. at 203 n. 25 ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'"); Endrew F., 137 S.Ct. at 1001 n. 2 ("We declined to hold in Rowley, and we do not hold today, 'every handicapped child who is advancing from grade to grade . . . is automatically receiving a [FAPE].'").  See also, e.g., D.S. v. Bayonne Board of Educ., 602 F.3d 553, 568 (3d Cir. 2010); Lauren P. v. Wissahickon School Dist., 310 Fed. Appx. 552, 554-55 (3d Cir. 2009) (defendant's "failure to address [the child's] behavioral problems in a systematic and consistent way denied [her] a FAPE."); Mr. and Mrs. Doe v. Cape Elizabeth School Dist., 832 F.3d 69, 79-81(1st Cir. 2016) (district court erred in finding that student did not suffer from Specific Learning Disability based on measures of

student's academic achievement, including grades); West Chester Area School Dist. v. Bruce C.,

194 F. Supp.2d 417, 421 (E.D. Pa. 2002) (academic progress cannot serve as the sole "litmus test"

for compliance with IDEA) (citing Rowley, 458 U.S. at 203, n. 25); G.D. v. Wissahickon School

Dist., 832 F. Supp.2d 455, 466 (E.D. Pa. 2011) ("the District had an obligation to look beyond

simply Jack's cognitive potential or academic progress and to address the attentional issues and

behaviors that [student's teacher] had identified as impeding his progress").[2]

---

[2] The United States Department of Education, Office for Civil Rights ("OCR") on July 26, 2016 issued a "Dear Colleague Letter and Resource Guide on Students with ADHD." See http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201607-504-adhd.pdf. Zachary is diagnosed with ADHD and exhibits executive functioning deficits. These materials highlight the fundamental mistake that the Hearing Officer made with regard to Zachary – focusing on his grades and being passed by the District grade-to-grade while giving scant attention to the ADHD, executive functioning, and other issues that caused him to struggle in school every single day.

In these materials, OCR specifically notes that the prevalent problem of students with ADHD and other students with deficits in executive functioning is the fact that they are so often not provided with appropriate resources to address such issues, in violation of IDEA, Section 504 and the ADA. OCR also warned that the needs of such students are often overlooked because the student may receive satisfactory grades:

> For example, a student who is easily distracted and unfocused may very well be manifesting an unaddressed ADHD that indicates the need for behavioral and executive function supports to improve focus and organizational skills, such as support in organizing a task, getting started, and remaining engaged in a task. But a student could also present with ADHD and depression, which would indicate additional or different needs. Under these circumstances, an evaluation is the best means for a district to make an informed determination of the student's individual educational needs. Someone with ADHD may achieve a high level of academic success but may nevertheless be substantially limited in a major life activity due to his or her impairment because of the additional time or effort he or she must spend to read, write, or learn compared to others.

Resource Guide at 12. OCR also emphasized that for students with attentional issues such as Zachary, "their substantial functional limitations, including those pertaining to starting a task or organizing and recalling information, can present them with overwhelming challenges to learning." Id. at 13. These are exactly the "overwhelming challenges" that Zachary faces and that went unaddressed by the District, but which the Hearing Officer diminished and dismissed due to Zachary's passing grades and being advanced grade to grade by the District.

As such, the Hearing Officer erred in focusing primarily on course grades and grade level promotion while ignoring myriad, compelling evidence in the record that Zachary was struggling in multiple educational areas due to the District's inadequate and inappropriate IEPs, which denied FAPE to Zachary.

## II.    CONCLUSION

For the foregoing reasons, and the reasons set forth in their opening brief/memorandum and complaint, the Plaintiffs respectfully request that this Court:

1.      Reverse the Hearing Officer's Decision to the extent that it fails to find that the District provided Zachary with inappropriate evaluations and programs, and reverse the Hearing Officer's ruling dismissing claims based on the statute of limitations;

2.      Order the District to provide appropriate compensatory education for Zachary's 2014-2015 through 2016-2017 school years; tuition reimbursement for Zachary's 2017-2018 and 2018-2019 school years; and reimbursement for Dr. Schmidt's IEE; and

3.      Declare the District's actions and omissions to be violative of IDEA, Section 504, the ADA, and Pennsylvania law.

Respectfully submitted,


/s_____
John W. Goldsborough, Esquire
ID No. 73063
Michael J.  Connolly, Esquire
ID No.  82065
Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS, MEHALICK, CONNOLLY, HULSE,
RYAN & MARONE P.C.
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)

Attorneys for Plaintiffs

## Certificate of Service

I hereby certify that a copy of the foregoing Plaintiffs' Reply Brief in Further Support of

Motion for Judgment on the Administrative Record was served upon the following person in the

manner indicated below, which service satisfies the requirements of the Federal Rules of Civil

Procedure:

**VIA ELECTRONIC FILING**

Karl Romberger, Esquire
Sweet, Stevens, Katz & Williams
331 East Butler Avenue
P.O. Box 5069
Doylestown, PA 18901

/s/_____
John W. Goldsborough, Esquire

Dated:          November 19, 2019